COMMONWEALTH *vs.* BURTON L. SCHAFER.

No. 91-P-227.

Middlesex. October 8, 1991. - June 22, 1992.

Present: PERRETTA, FINE, & JACOBS, JJ.

*Extortion. Threatening. Due Process of Law*, Vagueness of statute. *Evidence*, Relevancy and materiality. *Judge. Practice, Criminal*, Trial jury-waived.

The terms of G. L. c. 271, § 39 (*b*), which makes criminal the act of "threaten[ing] an economic injury to another . . . with intent to compel the person to do any act, involving the use or disposition of anything of value against his will," gave reasonable notice to a criminal defendant that his actions were proscribed, and the statute was not unconstitutionally vague. [687-689]

The evidence at the trial of an indictment under G. L. c. 271, § 39 (*b*), was sufficient to warrant a finding of guilty. [689-691]

There was no merit to the claims of a criminal defendant that certain admitted evidence was unduly prejudicial and irrelevant [691]; that the trial judge was biased against him [691-692]; or that the judge improperly denied the defendant's requests for rulings under Mass.R.Crim.P. 26 [692].

INDICTMENT found and returned in the Superior Court Department on January 8, 1988.

The case was heard by *Hiller B. Zobel*, J.

The case was submitted on briefs.

*George G. Burke* for the defendant.

*Thomas F. Reilly*, District Attorney, & *Deanne E. B. Ross*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. Numerous claims of error are made by the defendant on his appeal from a conviction after a bench trial on an indictment charging him with threatening economic injury. His primary contention is that the statute, G. L. c. 271, § 39(*b*), as amended by St. 1980, c. 531, § 3, is void for vagueness. Concluding that the statute, as applied to the

defendant's conduct, is not impermissibly vague and that there was no error in the various rulings of which the defendant complains, we affirm the conviction.

1. *Background.* This case involves a statement made by the defendant in the course of his dealings with the owner of a business who was attempting to secure a bank loan. To put the statement in its appropriate context, we set out G. L. c. 271, § 39(*b*), before relating the evidence. The statute reads: "Whoever, verbally or by a written or printed communication, threatens an economic injury to another, or threatens to deprive another of an economic opportunity, with intent to compel that person to do any act, involving the use or disposition of anything of value against his will, shall be punished . . . ."

There was conflict between the testimony of the victim and the defendant concerning the pertinent events. However, the trial judge, in explaining the basis for his guilty finding to the defendant, stated that he accepted the victim's version and did not "credit contrary testimony of the defendant." We, therefore, set out the facts mostly as related by the victim.

Lawrence Berger and his wife owned and operated the Edgebrook Nursery School, a business which they purchased from the defendant, an attorney, in 1977. The purchase money was obtained with three mortgage loans, two from banks and one from the defendant. Berger decided, in the spring of 1987, that he wanted to refinance the school. While he was making a mortgage payment to the defendant, he raised the topic. The defendant told Berger that he should speak first with people at the banks holding the two mortgages.

Although one of the banks was willing to refinance Berger's loans, Berger thought the terms unfavorable. He returned to the defendant in July and asked whether he knew of any other banks that might be willing to refinance his business. On or about July 16, the defendant introduced Berger to Craig Schermerhorn, a loan officer with the Lowell Institute for Savings (the bank). Berger was seeking a loan in the

amount of $575,000. Time was important to him. His business owed money to the Internal Revenue Service (IRS). There was evidence to show that he had told an IRS agent that he would pay between $20,000 and $25,000, against the tax liability on or about August 17.

In late July, Schermerhorn informed Berger that the bank would consider a loan but only up to $450,000. Berger would have to pay the bank an origination fee (one point) and the defendant's counsel fees (the "customary amount" of one percent of the loan) for representing the bank. Berger accepted these terms, and the loan approval process was put in motion. As the days passed, Berger became increasingly anxious about the time involved in the approval process. He made repeated calls to the appraiser retained by the bank to urge completion and delivery of the appraisal report on his property.

There were several telephone conversations between Berger and the defendant on August 7. On that date, the defendant called Berger and made the statement which is the focus of the indictment. He told Berger that he had some "good news and bad news." The "good news" was that the bank had agreed to give Berger the loan for $450,000. The "bad news," however, was that "somebody" was going to have to be paid two extra points. More specifically, in order to have his loan application processed, Berger was going to have to pay an origination fee of two points to the bank (instead of one, as previously noted), another point for the defendant's legal fees, and two additional points for "somebody" outside the bank. Berger responded that, before he paid anyone two extra points, he would like to meet and speak with that person. The defendant refused, saying that it was "impossible."

Uncomfortable with this news, Berger told the defendant that he did not like the arrangement, that he would have to think about it, and that he would get back to him. He discussed the matter of the two extra points with his wife, and then he spoke with his son, an attorney. Because he "needed the cash," Berger called the defendant and agreed to pay the

two extra points. Although the defendant might not have known about Berger's deadline (August 17) with the IRS, he was aware that Berger had tax problems and was very anxious that the loan go through.

Four days later, August 11, Berger was trying to reach Schermerhorn. He needed a commitment letter from the bank. When he was told that Schermerhorn was ill and not at work, Berger called the defendant and told him, "Reach this guy and tell him to get going and get this loan put through, and I'll buy him a box of cigars." The defendant assured Berger that he had bought Schermerhorn "more than a box of cigars, its on a go." Berger called the defendant an hour later to ask whether he had been able to speak with Schermerhorn. The defendant said he was going to call the person who was going to get the loan "done," a Mr. Sullivan. The loan closed two days later.

On the morning of August 13, the loan proceeds were deposited into the defendant's client account. The 2:00 P.M. closing at the bank was attended by Berger, his attorney,[1] Schermerhorn, and the defendant. As the proceeds had been deposited into the defendant's client account, he wrote all the necessary checks. Three were in discharge of the mortgages. A check for the bank was written in the amount of $57,250, in payment of the origination fee of one point ($4,500), the appraisal report ($1,000), and interest for one year ($51,750). The defendant also made out a check, payable to himself, for his legal fees in representing the bank ($4,500).

Four checks were then made out to the Edgebrook Corporation, the corporate name of the Bergers' business. Two of the four ($15,000 and $47,601.30) represented Berger's proceeds from the loan and were deposited into the business's coporate accounts. The other two were in the amounts of $9,000 and $4,500. Their total, $13,500, was equal to three points on the loan. Berger asked the defendant why he was being charged three points rather than the two, as the de-

---

[1]Although the defendant may have done legal work for Berger in respect to the loan closing, he represented the bank. Separate counel for Berger attended the closing with him.

fendant had represented on August 7. The defendant leaned over to Berger and quietly explained: "[S]ince the bank is only charging you one point, we're going to charge you three points. It's the same amount of money, it's just getting cut up differently." Berger endorsed the checks and gave them back to the defendant.

The defendant took the two checks and showed them to a man who had entered the room shortly after the closing had begun. The man never spoke, and introductions were not made. He was later identified as Gary Sullivan. Nodding to each other, the defendant and Sullivan left the room and went to tellers' windows to cash the checks. There was evidence to show that the bank had a policy that corporate checks had to be deposited into an appropriate corporate account and could not be cashed. There was also evidence, the checks, to show that, after Berger had endorsed and returned the checks made payable to Edgebrook Corporation to the defendant, the defendant's name had been added as an alternate payee. After the checks were cashed, the defendant returned to the room, alone, and completed the closing.

It was the bank's policy to record all loan fees and disbursements on the various loan documents. In the present case, however, none of the documents disclosed that Berger had paid an additional $13,500, or three extra points.

Although the trial judge did not accept the defendant's version and characterization of the critical events, we set out some of his testimony concerning the disbursement of the $13,500. The defendant took $4,500, as either legal fees or a finder's fee. If legal fees, they would be in addition to those paid by the bank. If a finder's fee, it was for services different from those rendered by Sullivan. A finder has no responsibility to push a loan through a bank found willing to lend the money. Sullivan received $9,000 for his role as a mortgage "expediter." It is the expediter who "gets the loan officer to complete the package, to write up the report, to put it from the bottom of the pile to the top of the pile, to take into whoever's the approving authority, to get the appraisal . . . [ done ]." To carry out these functions, an ex-

pediter uses "[p]ersonality, friendship, [and] politics." The defendant brought Sullivan into the transaction to expedite Berger's loan. Sullivan knew Schermerhorn and other people at the bank, and he had been involved with the bank on other occasions, as a finder and as a mortgage broker. The defendant thought that he could probably speed up the approval of Berger's loan. After he spoke with Sullivan about the matter, he reported to Berger and told him that Sullivan could get his loan closed in a week and that his fee would be two points. Berger knew all this when he asked the defendant to involve Sullivan in the approval process.

In explaining the basis of the guilty finding, the trial judge found that the defendant knew of Berger's worries about the IRS and that he was "very anxious that the deal take place." Turning to the defendant's conversation with Berger on August 7, the trial judge found that the "good news and bad news" statement was a threat: the loan would not go through "unless the so-called 'two points,' that is, the $9,000 payment, which ultimately, the evidence showed, went to Mr. Sullivan, was made."

2. *The statute.* In arguing that G. L. c. 271, § 39(*b*), is unconstitutional, the defendant complains that its terms and scope are so vague that it fails to give a person of ordinary understanding sufficient notice and definition of what acts are criminal and that it lends itself to arbitrary enforcement. See *Grayned* v. *Rockford*, 408 U.S. 104, 108 (1972); *Commonwealth* v. *Williams*, 395 Mass. 302, 304-305 (1985). As support for his argument, the defendant isolates the words "threat" and "economic opportunity" and conjectures that a person could be subject to criminal liability for threatening to withdraw from a potential transaction.

Our consideration of this attack on the statute "must be based solely on the circumstances of the defendant's case," *Commonwealth* v. *O'Connor*, 406 Mass. 112, 121 (1989), and the range of behavior which he suggests may be proscribed by the statute is not relevant. As explained in *Commonwealth* v. *Love*, 26 Mass. App. Ct. 541, 544-545 (1988), "[b]y a settled rule in the Commonwealth, . . . so broad a

contention, which asks the court to consider all situations to which the statute might be applied, and to void it if any of the applications would be unconstitutional, is reserved for cases where the statute appears to trench on First Amendment (or similar) rights. The present statute is not of that type, so the question whether it could withstand 'facial' scrutiny is irrelevant. Rather, the question is whether the statute, or, more closely, the particular words objected to, identify for citizens and law enforcement authorities a core of condemned conduct, and whether this case, as it shaped up, appears to be within the core: the inquiry is contextual." (Citations omitted.)

As the trial judge found, the defendant knew that Berger "was very anxious that the deal take place." The defendant, fully aware of Berger's financial situation, told him that the loan would not be approved unless he paid $9,000 over and above the normal and agreed upon terms to someone outside the bank for a reason unrelated to the lending process. If it appears to the defendant that certain words in the statute are somewhat amorphous, they take on clarity when read in the light of their usage. "[S]ince words are the elements that consitute a statute, mathematical precision in the definition of legislative enactments is not required. *Grayned* [v. *Rockford*, 408 U.S.] at 110. A statute is satisfactory so long as it clearly indicates what it prohibits as a whole. *Id.*" *Commonwealth* v. *Bohmer*, 374 Mass. 368, 372 (1978). The statute gives fair warning that it is a crime to coerce someone to give up something of value in order to avoid the infliction of an "economic injury" or the loss of an "economic opportunity." Irrespective of whatever may be the outer limits of an economic "injury" or "opportunity," the facts of this case show that the defendant's actions fell well within the core of that type of conduct prohibited by the statute. Neither the defendant nor Sullivan was a principal in the loan transaction, nor did either man have an interest or say in the loan and its terms.

Both law enforcement officials and the defendant reasonably could be expected to understand that the conduct in

question was proscribed by this statute, see *Commonwealth v. Love*, 26 Mass. App. Ct. at 546, which speaks to a species of extortion. General Laws c. 265, § 25, as amended by St. 1932, c. 211, provides in pertinent and analogous part: "Whoever . . . by a verbal or written or printed communication maliciously threatens an injury to the *person or property of another* . . . with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished . . ." (emphasis supplied).

As discussed in *Commonwealth v. Snow*, 269 Mass. 598, 608 (1930), "[f]our factors constitute the crime set forth in . . . § 25: (1) a malicious threat (2) made to a named person (3) of personal injury to some one (4) with intent to extort money. See *Commonwealth v. King*, 9 Cush. 284, 287 [1852]; *Commonwealth v. Reynolds*, 14 Gray 87, 89, 90 [1859]." See also *Commonwealth v. DeVincent*, 358 Mass. 592, 595 (1971); *Commonwealth v. Matchett*, 386 Mass. 492, 499-500 (1982). The word "maliciously," which appears in § 25, is used in its ordinary sense. "The wilful doing of an unlawful act without excuse is ordinarily sufficient to support the allegation that it was done maliciously and with criminal intent." *Commonwealth v. Goodwin*, 122 Mass. 19, 35 (1877), discussing G.S. 1860, c. 160, § 28, the predecessor of G. L. c. 265, § 25. The absence of the word "maliciously" from G. L. c. 271, § 39(*b*), does not make that statute significantly different from the prohibition set out in c. 265, § 25. The significant difference between the two statutes is the object of the threatened harm, § 25 aimed at personal injury and § 39(*b*) directed to economic injury, which may or may not include property in which the victim has an ownership or possessory interest.

3. *The sufficiency and weight of the evidence.* Taking the evidence in the light most favorable to him, the defendant argues that the trial judge erred in denying his motion for a required finding of not guilty which was made at the close of the Commonwealth's case. See Mass.R.Crim.P. 25(b), 378 Mass. 896 (1979). He claims that the Commonwealth failed

to show that he made a "threat to deprive" or that Berger was compelled to do an act "against his will." Rather, he argues, the Commonwealth showed only that he attempted to assist Berger in obtaining approval of the loan. On August 7, Berger initiated contact with him for assistance. He needed a commitment letter, and the bank had not yet received the appraisal report. The defendant, in turn, "spoke to the loan officer" and "relayed the facts" to Berger. When Berger asked him what he should do, the defendant gave a "suggestion, not an ultimatum." It was only "upon reflection" that Berger told the defendant to proceed. If Berger felt compelled to go forward, it was because of his own financial situation and not any threat by the defendant.

We take the evidence in a different light. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). As previously recited, Schermerhorn told Berger in late July that, if the appraisal and other documents were in order, the bank would approve a loan in the amount of $450,000. The Commonwealth also presented evidence to show that, although the appraiser received numerous phone calls from Berger, he never spoke with a Mr. Sullivan. He completed the report in due course and delivered it to the bank on August 10.

Chester Szablak, Schermerhorn's superior, testified that only he and three other officers in the bank could approve a loan in the amount of $450,000. Schermerhorn was not one of the three. When Schermerhorn brought Berger's application for a $575,000 loan to him in late July, he told him that Berger's real estate could not support that high a loan. Schermerhorn returned to Szablak with an appraisal report on August 12, and Szablak approved the loan for $450,000. Throughout this entire period, July and August, it was the bank's practice to use mortgage brokers or facilitators only when purchasing loan packages from companies. Although Szablak knew Sullivan, he had no communication with him concerning Berger's loan application.

This evidence, along with Berger's testimony and the closing documents, was sufficient to warrant a finding of guilty. The fact finder could reasonably infer that the defendant

threatened to delay or frustrate the transaction unless Berger paid someone an amount of money in excess of that required by the bank. Even had the defendant renewed his motion at the close of the Commonwealth's case or presented the trial judge with the argument which he now makes for the first time, that the finding of guilty was against the weight of the evidence, our conclusion would be no different. The Commonwealth's case had not deteriorated by the time of the close of all the evidence. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976). If anything, it was strengthened by the defendant's testimony that Sullivan had no employment relationship with the bank and that he could think of no reason why the closing documents did not reflect the $9,000 payment by Berger to Sullivan. The guilty finding is supported by sufficient credible evidence. Cf. *Commonwealth* v. *Riva*, 18 Mass. App. Ct. 713, 719 (1984).

4. *Other issues.* There remain three claims which require little discussion. The defendant argues that, because a violation of § 39(*b*) is complete once the threat is made, the trial judge erred in admitting the closing documents and cancelled checks in evidence. The claim, that those exhibits were unduly prejudicial and irrelevant, fails for the reasons discussed in *Green* v. *Richmond*, 369 Mass. 47, 59 (1975), and the cases and authorities therein cited.

We can find no support in the transcript for the defendant's assertion that the trial judge displayed bias and prejudice against him by inquiring about the "possibility of a disposition short of a verdict." While making that statement, the trial judge cautioned the parties that although the testimony and exhibits "so far" received raised serious questions, Berger had yet to be cross-examined. Other statements about which the defendant complains were made by the trial judge in response to inquiries about a guilty plea and for the purpose of clearing up any of the defendant's uncertainties concerning related charges and indictments. Moreover, we think it hyperbole to characterize the defendant's sentence (two days' incarceration, the remaining four years suspended with 500 hours of community service, and restitution) as reflective

of the trial judge's bias against him. In sum, there is nothing in the trial judge's statements or actions which supports the defendant's allegation of a bias against him. See generally *Commonwealth* v. *Coleman*, 390 Mass. 797, 801-803 (1984).

Requests for rulings under Mass.R.Crim.P. 26, 378 Mass. 897 (1979), are "intended to secure for the purpose of review a separation of law from fact in cases where the trial judge acts both as factfinder and applier of law." Reporters' Notes to Mass.R.Crim.P. 26, Mass. Ann. Laws, Rules of Crim. P., at 441 (Law. Co-op. 1979). Although the trial judge did not specifically rule upon the defendant's requests, his decision constitutes their denial. See Smith, Criminal Practice and Procedure § 1952 (2d ed. 1983). Based upon the statements he made in ruling upon various objections and in explaining the guilty finding, we conclude that the trial judge knew and applied the correct principles of law to the evidence he deemed credible.

*Judgment affirmed.*