**HOLMES PRODUCTS CORP., Plaintiff,**

v.

**DANA LIGHTING, INC. and Nathan Katz, Defendants.**

**Civil Action No. 94–40109–NMG.**

United States District Court, D. Massachusetts.

March 19, 1997.

---

Dustin F. Hecker, Postemak, Blankstein & Lund, Boston, MA, Sibley P. Reppert, Samuels, Gauthier, Stevens & Reppert, Boston, MA, for Holmes Products Corp.

Bruce R. Parker, Michael B. Keating, Foley, Hoag & Eliot, Boston, MA, Janet P. Ailstock, Catalina Lighting, Miami, FL, for Dana Lighting, Inc., Nathan Katz.

## MEMORANDUM AND ORDER

GORTON, District Judge.

The above entitled action was filed on July 21, 1994, by the plaintiff, Holmes Products Corp. ("Holmes") against defendants Dana Lighting, Inc. ("Dana") and Nathan Katz ("Katz") (collectively, "the defendants"). The Complaint alleges tortious interference by the defendants with the contractual relationship between plaintiff and Go–Gro Industries, Ltd. ("Go–Gro"), a Hong Kong company which, prior to the alleged tortious interference of defendants, agreed to manufacture four models of lamps for Holmes. The plaintiff seeks restitution damages (Count VI) resulting from the alleged tortious interference of the defendants (Counts I and II) which conduct plaintiff further contends constitutes:

1. an unfair and deceptive act or practice in violation of M.G.L. c. 93A (Count III);

2. a violation of the Civil RICO statute, 18 U.S.C. § 1961 *et seq.* (Count IV); and

3. a violation of the federal antitrust law, 15 U.S.C. § 1 "the Sherman Act" (Count V).

Plaintiff invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1331.

Pending before this court are a) defendants' motion for judgment on the pleadings or, in the alternative, for partial summary judgment filed August 29, 1995, and b) defendants' motion to strike the testimony of Danny Lavy filed August 2, 1996.

## I. *Background*

### A. *The Parties*

Holmes is a Massachusetts corporation with a principal place of business in Milford, Massachusetts which designs, manufactures and sells a wide variety of consumer items, such as air purifiers and lamps, predominantly to large retail outlets. Dana, a division of Catalina Lighting, Inc., is a Delaware corporation with a principal place of business in West Bridgewater, Massachusetts. Dana is a major supplier of lighting products and a direct competitor of Holmes in the lighting

business. Nathan Katz is the President of Dana.

Holmes established its "Lighting by Holmes" Division in 1992 for the purpose of developing and selling a full line of lamps. From July, 1992, until February, 1993, Holmes contracted with Go–Gro for the delivery of a number of specially designed lamps. Go–Gro also manufactured lighting products for Dana.[1]

### B. *The Products at Issue*

The Dana and Holmes products at issue in this case are referred to in the industry as "functional", "commodity" or "low end" lamps. They are competitively priced and relatively inexpensive. In 1993, Go–Gro sold such lamps to distributors, including Dana, at prices ranging from $3 to $10 per lamp for resale to large mass merchants and discount retailers which in turn sold them to consumers for prices ranging from $10 to $30.

### C. *Dana's Alleged Interference With the Holmes–Go–Gro Relationship*

Holmes' claim for tortious interference depends heavily upon a letter dated February 12, 1993, from Richard Lau, president of Go–Gro, to Holmes. Go–Gro was the principal supplier of critical components of the new "low end" line of lamps that Holmes was then introducing to customers. Lau's letter stated, in relevant part:

> We have just finished all the positive films yesterday so that printer now could proceed to make the printing mechanicals for your color boxes.
>
> Unfortunately, I received a phone call from the President of Dana—Mr. Nathan Katz who warned me that if Go–Gro dared to ship one piece of lamp to Holmes, Dana would then cancel all the orders placed with Go–Gro.
>
> Dana is our biggest customer and we do rely on their orders. We are extremely sorry that we cannot accept any of your planned orders.

As a result of that letter, Holmes secured an alternative source to manufacture its new line of "low end" lamps, but asserts that the new manufacturer was no substitute for Go–Gro. Holmes contends that Go–Gro's cancellation, which it attributes to Dana's threat to withdraw its business, caused a measurable delay in the marketing of its new line of lamps and a substantial reduction in the quality of product that it eventually received from the manufacturer.

### D. *Dana's Alleged Attempts to Interfere With Orders of Other Competitors*

In 1990, Dynasty Classics, Ltd. ("Dynasty") was also a competitor of Dana and bought lamps and other products from manufacturers in the Far East, including Go–Gro. David Lo worked for Dynasty and his contact at Go–Gro was Richard Lau. He negotiated with Mr. Lau about the manufacture of a particular lamp model which was never produced. After Mr. Lo left Dynasty in 1991, he went to work for another competitor, Spartus, and again met with Mr. Lau on behalf of Spartus. Lo contends in his affidavit that Lau apologized to him about Go–Gro's prior refusal to fill Dynasty's order and told him the reason was Dana's insistence that Go–Gro not do business with Dynasty.

Dana and its parent, Catalina, have been pursuing separate legal action against a Mr. Danny Lavy and his employer, Elite Classics, Inc. ("Elite"), which also competes with Dana. Until the end of 1993, Lavy had been the President of a Dana affiliate in Canada. In early 1994, Lavy spoke, met and corresponded with Mr. Lau about the possible purchases by Elite of products to be produced by Go–Gro. According to the deposition testimony of Lavy, despite Lavy's persistent efforts, Go–Gro never produced the lamps that it agreed to produce and Lau made it clear to him that the source of the problem was Dana and Dana's parent, Catalina. Moreover, Lavy asserts, his negotiations with another Far East manufacturer, Handing Co. Ltd. ("Handing") were stalled when he was told by Handing that Catalina and/or

---

**1.** In 1993 Go–Gro's annual sales throughout the world were $37,200,000 of which Dana account-   ed for $8,300,000 or 22.3%.

Dana had put pressure on it not to do business with Lavy or Elite. Lavy's deposition testimony is the subject of defendant's motion to strike discussed *infra.*

## II. *Discussion*

### A. *Motion For Summary Judgment*

#### 1. *Standard of Review*

The role of summary judgement is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most hospitable to the non-moving parties and indulge all reasonable inferences in their favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

If the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case," the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *FDIC v. Municipality of Ponce,* 904 F.2d 740, 742 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)).

#### 2. *Contractual Interference Claims*

To prevail on a claim for tortious interference with contractual relations, Holmes must prove that it had a contract with Go–Gro, that Dana and/or Katz knowingly induced Go–Gro to breach that contract, that defendants' interference, in addition to being intentional, was improper in motive or means, and that Holmes was harmed by defendants' action. *United Truck*

*Leasing Corp. v. Geltman,* 406 Mass. 811, 812, 551 N.E.2d 20 (1990).

Defendants assert that even if the alleged interference did take place, their motive and means were entirely proper. They argue that their letter threat of withdrawing business from Go–Gro was entirely proper and was not made to keep Holmes out of the lamp market for as long as possible. They contend that such a motive makes no economic sense because preventing Holmes (a subsidiary of a multinational giant) from dealing with Go–Gro would have had no significant impact on its entry into the highly competitive "commodity" lamp market. Holmes could have engaged any number of other suppliers or could have built its own factory (which apparently it has subsequently done).

Defendants argue that if Katz said what Lau says he said, Katz' only possible motivation would have been to keep Holmes from dealing with one of Dana's principal suppliers, a supplier with access to Dana's plans, tooling, color boxes etc. Such motivation, defendants conclude, is perfectly permissible and commonplace.

Holmes responds that 1) defendants knew of the existence of its contract with Go–Gro 2) Dana's letter to Go–Gro is sufficient to raise a genuine issue of material fact on the interference issue and 3) a jury could reasonably infer from the letter alone that Katz and Dana knew enough of Holmes' relationship with Go–Gro to satisfy the elements of a claim for interference.[2] With respect to defendants' protection of economic self interest claim, Holmes argues that advancing one's economic self-interest, while broadly permitted, clearly is not unlimited by the law. It contends that the defendants were motivated to harm Holmes and for no other legitimate purpose. It cites *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 817, 551 N.E.2d 20 (1990) and *Schwanbeck v. Federal–Mogul Corp.,* 31 Mass.App.Ct. 390, 413, 578 N.E.2d 789 (1991), for the proposition that a motive to harm or a desire to hurt qualifies as an improper motive.

**2.** Defendants' do not dispute, at least for the purposes of this motion, that a contract existed

between Holmes and Go–Gro to supply lamps.

■ To succeed on its claim, Holmes needs only to show an improper motive or improper means. *Draghetti v. Chmielewski*, 416 Mass. 808, 816 n. 11, 626 N.E.2d 862. While "competing for the prize" is within the realm of permissible interference, the use of "leverage" to create a breach is not. *Schwanbeck*, 31 Mass.App.Ct. at 413, 578 N.E.2d 789. Relying on *Schwanbeck* therefore, plaintiff alleges that Dana used its leverage as the single largest customer of Go–Gro to interfere with the Holmes/Go–Gro contract.

■ Holmes has also made a claim against defendants for interference with prospective economic relations. The same knowledge and improper means that are required to prove a claim for interference with an existing contract are also required to prove a claim for interference with a prospective or advantageous business relationship. *Dulgarian v. Stone*, 420 Mass. 843, 851 n. 8, 652 N.E.2d 603 (1995); *Draghetti v. Chmielewski*, 416 Mass. 808, 818 n. 14, 626 N.E.2d 862 (1994); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 816, 551 N.E.2d 20 (1990); *American Private Line Services, Inc. v. Eastern Microwave, Inc.*, 980 F.2d 33, 36 (1st Cir.1992).

This Court concludes that there is enough evidence of 1) both defendants' knowledge of a contractual relationship and an advantageous business relationship between Holmes and Go–Gro and 2) improper means and motive of defendants' alleged interference to raise a genuine issue of material fact. Defendants' summary judgement motion with respect to plaintiff's claim of tortious interference with contractual relations and interference with prospective economic relations will, therefore, be denied.

### 3. *Antitrust Claim*

Dana and Katz argue that plaintiff's allegations, even if true, do not constitute a violation of § 1 of the Sherman Act as a matter of law. To constitute such a violation, defendants assert, plaintiff must demonstrate both that Dana had market power and that Dana's actions to secure exclusive dealing arrangements, in effect, foreclosed available supply or outlet capacity such that existing competitors or new entrants were excluded. *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir.1993).

■ At the outset, this Court works from the premise that antitrust law protects "competition, not competitors," *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) and that "[i]t is only when the market is being distorted by anticompetitive conduct that the antitrust laws should be invoked." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir.1991). Defendants contend that Holmes has not alleged, and cannot allege, given the nature of the products and markets at issue, facts that would suggest that their actions had any impact upon competition. Moreover, they assert, Holmes has not offered, and cannot offer, any evidence that their conduct caused it to be foreclosed from the market or resulted in higher prices to consumers.

Holmes claims that defendants procured agreements, or sought to procure agreements, from certain suppliers of lamps not to supply lamps to defendants' competitors. Even assuming such is the case, as is appropriate in consideration of this summary judgment motion, such a vertical restraint would, absent market power on defendant's part, be perfectly legal. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54–55, 97 S.Ct. 2549, 2559–60, 53 L.Ed.2d 568 (1977); *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 333–34, 81 S.Ct. 623, 631–32, 5 L.Ed.2d 580 (1961). Courts have consistently held that vertical, non-price restraints are not *per se* illegal, but instead are subject to the rule of reason. *Continental T.V.*, 433 U.S. at 57–59, 97 S.Ct. at 2561–62; *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1569 (11th Cir.1991).

■ To survive summary judgment in an exclusive dealing arrangement, Holmes must, therefore, present facts from which a jury could find sufficient market power to effect foreclosure of available supply or outlet capacity such that existing competitors or new entrants may be excluded. *U.S. Healthcare, Inc.*, 986 F.2d at 595–97. Defendants argue that in order for plaintiff to prevail, it must

make "a compelling showing of [market] foreclosure of substantial dimensions" *Id.* at 596. They then explain that neither Dana nor any other player in the "low-end" lamp market has the market power necessary to have an impact on the market by virtue of an exclusive dealing agreement or any other vertical restraint.

The products at issue in this case are inexpensive lamps that generally retail for between $10 and $30 and are sold at high volume retailers like Walmart. This is a market, defendants contend, with low brand recognition, simple technology, hundreds of existing manufacturers, no dominant players and low capital requirements. The products are extremely price-sensitive and there are no competitive barriers to entry. Dana asserts that if it (controlling, as it does, less than 10% of the particular market) attempted to raise prices by restricting output, the buyers of such lamps, who already purchase from Dana's competitors, would simply buy more lamps from other distributors or, like K-mart, would buy directly from one of the numerous Asian suppliers.

The Court agrees that Holmes has not set forth facts which support a claim that Dana either had market power or that Holmes was foreclosed from entering the market for "commodity" lamps at issue. Moreover, the plaintiff has not presented a theory as to how Dana's alleged "pressure" on suppliers has had an adverse impact on the competition in the lamp market and with respect to allegations of illegal vertical restraints, theorizing is not enough. *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984) (upholding an exclusive dealing contract because the plaintiff had neither properly defined the relevant product market nor proven that the contract actually restrained competition.)

■ Holmes urges this Court to adopt the "quick look" rule of reason analysis which applies to cases where "per se condemnation is inappropriate, but where 'no elaborate industry analysis is required to demonstrate [the] anti-competitive character' of an inherently suspect restraint." *U.S. v. Brown University,* 5 F.3d 658, 669 (3rd Cir.1993) (quoting *NCAA v. Board of Regents of the U. of*

*Oklahoma,* 468 U.S. 85, 109, 104 S.Ct. 2948, 2964, 82 L.Ed.2d 70 (1984)). By imploring the application of the "quick look" doctrine, the plaintiff asks this Court to presume competitive harm and to place the burden on the defendants to come forward with a competitive justification for the restraint. The Court declines to do so because plaintiff has failed to allege any impact on competition (as opposed to an individual competitor) and the "quick look" rule of reason analysis is therefore inappropriate.

■ The Court concludes that there is no violation of the Sherman Act as a matter of law because an exclusive dealing contract (the nature of the alleged violation here) does not constitute an antitrust violation unless the competition which is foreclosed constitutes a substantial share of the relevant market. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. at 327, 81 S.Ct. at 628. Confronted with defendants' summary judgment motion, Holmes must present credible evidence from which a logical fact finder could conclude that Dana's acts had an anticompetitive impact. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The plaintiff has not met its burden and summary judgment will, therefore, be entered for defendants on Holmes' antitrust claim.

### 4. *RICO Claim*

■ To state a valid RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege with respect to each defendant the four elements required by the statute, namely: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 41 (1st Cir. 1991), *quoting Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The defendants assert that Holmes has failed to allege sufficiently any of the required elements. Because a failure to allege any one of the four elements of a RICO claim renders it defective, this Court focuses on what is, in its opinion, the strongest of defendants' arguments made in its motion for summary judgment.

Defendants assert that Holmes has not identified two or more predicate acts as is required of a RICO plaintiff. Only "racketeering activities" as enumerated by statute constitute predicate acts under RICO. *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir.1991) ("to avert dismissal under Rule 12(b)(6), a civil RICO complaint must, at a bare minimum, state facts sufficient to portray (i) specific instances of racketeering activity within the reach of the RICO statute and (ii) a causal nexus between that activity and the harm alleged.") Racketeering activities are defined in the RICO statute as:

(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year;

(B) any act which is indictable under [various specific provisions] of title 18, U.S.Code, [none of which has been alleged nor could apply here],

(C) any act which is indictable under [either of two sections of] title 29, U.S.Code [relating to labor unions],

(D) any offense involving fraud connected with a case under title 11 [bankruptcy], fraud in the sales of securities, or [certain listed narcotics law violations], or

(E) any act which is indictable under the Currency and Foreign Transactions Reporting Act.

18 U.S.C. § 1961(1).

Defendants contend that Holmes has failed to identify any such "racketeering activity" in its Amended Complaint.

In their Interrogatory No. 3, defendants requested that plaintiff:

Describe in full detail the "racketeering activity" referred to in paragraph 45 of the Amended Complaint and identify the criminal acts referred to in 18 U.S.C. § 1961(1) that Dana and/or Katz allegedly committed.

After objecting to the interrogatory as "overbroad and unduly burdensome", Holmes responded that the allegations include acts or threats involving extortion chargeable under state law and punishable by imprisonment for more than one year pursuant to M.G.L. c. 271 § 39.

The defendants argue that the acts alleged by Holmes could not, as a matter of law, constitute a violation of M.G.L. c. 271, § 39. They point out that subsection (a) of that statute criminalizes commercial bribery, which clearly has no application in this case, and subsection (b) is cited in only one case in the context of threats of economic injury. *Commonwealth v. Schafer*, 32 Mass.App.Ct. 682, 594 N.E.2d 875 (1992). In *Schafer*, the defendant (an attorney) and two banks held mortgages on property that Schafer had sold. The Buyer informed Schafer that, because of financial difficulties (i.e. money owed to the IRS), the buyer needed to refinance the loans. Schafer offered to help get a bank loan but shortly thereafter informed the buyer that a loan could be arranged for an additional $9,000 in "points" to be paid to "somebody" outside the bank.

In upholding a conviction under M.G.L. c. 39, the Massachusetts Appeals Court described the four elements of extortion: "(1) a malicious threat (2) made to a named person (3) of personal injury to some one (4) with intent to extort money." The court further stated that:

[t]he significant difference between [the traditional extortion statute, § 25 of Chapter 265, and subsection 39(b) of Chapter 271] is the object of the threatened harm, § 25 aimed at personal injury and § 39(b) directed to economic injury, which may or may not include property in which the victim has an ownership or possessory interest.

*Id.* at 689, 594 N.E.2d 875.

Defendants distinguish *Schafer* and the case at bar with the relevant argument that in contrast to the buyer in *Schafer*, who had a legal right to obtain a loan without paying bribes to third parties, the vendors who manufacture lamps (such as Go–Gro) have no legal right to Dana's business. At most, Holmes has alleged that Dana threatened to refuse to buy goods from a vendor who offered to sell goods to a competitor. As discussed above, agreements by suppliers

not to sell to a purchaser's competitors which do not foreclose competition in a substantial portion of the relevant market, are legal vertical restraints.

Holmes responds to defendants' arguments by contending that it has alleged facts sufficient to raise a genuine issue of material fact on the RICO claim, but, in the process, relies upon a vague assertion that defendants' alleged warnings to manufacturers, such as Go–Gro, constitute extortion. The only allegation remotely within the realm of extortion is the warning by Katz "that if Go–Gro dared to ship one piece of lamp to Holmes, Dana would then cancel all the orders placed with Go–Gro," but that statement is actionable, if at all, under the claim for tortious interference with contractual relations. Such conduct is not the kind of activity proscribed by Congress in the RICO statute and Holmes has not, therefore, alleged the required predicate acts.

Defendants have also argued persuasively that Holmes has failed to demonstrate any of the other three elements required under the RICO statute, but analysis of those arguments is unnecessary because summary judgment for defendants is appropriate on the aforementioned ground, i.e. failure to allege required predicate acts of "racketeering activity". This Court concludes that there is no genuine issue of material fact with respect to plaintiff's RICO claim, and summary judgment on that claim will, therefore, be entered for the defendants.

### 5. Consumer Protection Act (M.G.L. c. 93A) Claim

Defendants argue that Holmes' 93A claim should be dismissed because it lacks any independent basis and, upon dismissal of the other claims, the 93A claim should expire accordingly. Defendants cite *PMP Associates, Inc., v. Globe Newspaper Co.*, 366 Mass. 593, 599, 321 N.E.2d 915 (1975) for the proposition that

> a refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice under G.L. c. 93a, and is therefore not actionable.

Holmes attempts to distinguish *PMP Associates* but then cites it in support of the proposition that a Chapter 93A claim can stand on its own. Acknowledging the stated proposition, plaintiff argues that *PMP Associates* did not involve interference with the plaintiff's contract with a third party, but rather a straightforward refusal by the defendant to do business with the plaintiff. It suggests that *PMP* would be analogous to our case only if Go–Gro had sued Dana for refusing to do business with Go–Gro.

Plaintiff contends, moreover, that even if summary judgment were granted on all of Holmes' other claims, it would not be foreclosed from pursuing its claim under Chapter 93A, citing *Schwanbeck v. Federal–Mogul Corp.*, 31 Mass.App.Ct. 390, 578 N.E.2d 789 (1991). In *Schwanbeck*, after entering judgment for defendants notwithstanding the verdict on a contractual interference claim, the Massachusetts Appeals Court upheld judgment for plaintiff on the Chapter 93A claim:

> Although we have concluded that Schwanbeck's common law claims are not soundly based, G.L. c. 93A, § 11 affords businessmen certain remedies that elude conventional definitions and categories.

31 Mass.App.Ct. at 413, 578 N.E.2d 789 (*quoting Doliner v. Brown*, 21 Mass.App.Ct. at 697, 489 N.E.2d 1036). *See also,* M. Gilleran, *The Law of Chapter 93A*, p. 149 (1989) (Chapter 93A violation may be shown by "unfair business torts including . . . interference with contractual relations and malicious but otherwise lawful conduct").

■■■ Notwithstanding the general rule that a Chapter 93A violation can stand on its own and despite this Court's denial of defendants' motion for summary judgment on the counts for tortious interference, this Court concludes that Holmes has not alleged facts sufficient to sustain a claim under M.G.L. c. 93A. In *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1513 (1st Cir.1989), the First Circuit Court of Appeals confirmed the "rascality standard" required to sustain such a claim. It held that " '[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce.' " (citing *Levings*

*v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149 (1979)). Here, even if Holmes were to succeed on its claim for tortious interference with contractual relations, there is no evidence (nor even allegations) that defendants have committed acts so unfair or deceptive as to warrant recovery under Chapter 93A.

This Court concludes that a reasonable jury could not find that the actions of the defendants were so unfair or deceptive as to rise to the level of rascality required to support a claim for violation of the Consumer Protection Act. Defendants' statements to Go–Gro, even if proved at trial, can not be found to "raise the eyebrows" of an experienced supplier of household fixtures, "inured to the rough and tumble of the world of commerce." *See Ahern v. Scholz*, 85 F.3d 774, 799 (1st Cir.1996) (overruling district court's award under Chapter 93A based upon a manager's "commercially unreasonable" deductions because, despite manager's knowing breach of contract, there was insufficient rascality to rise to the level of a violation of Chapter 93A.) Defendants' motion for summary judgment on the Chapter 93A will, therefore, be allowed.

### 6. *Unjust Enrichment Claim*

◼ Defendants argue that the remedy of unjust enrichment is not available to a party with an adequate remedy at law. *Ben Elfman & Son, Inc., v. Criterion Mills, Inc.*, 774 F.Supp. 683, 687 (D.Mass.1991). They also assert that the relief sought by plaintiff is both unprecedented and illogical because the conventional measure of damages in interference claims is the plaintiff's lost profits. Defendants point out that in only one reported case involving a claim for interference with contractual relations were unjust enrichment damages awarded, *National Merchandising Corp. v. Leyden*, 370 Mass. 425, 348 N.E.2d 771 (1976). In that case defendant hired former employees of plaintiff to supervise and manage its telephone directory cover business in willful violation of noncompete agreements and a consent decree for which the court awarded plaintiff 10% of the defendant's gross sales made by persons under the

consent decree stressing that such sales were all "tainted".

Even assuming *arguendo* that Holmes has no remedy at law, to obtain "unjust enrichment" damages from Dana based upon its profits for lamp sales, Holmes would have to establish that those profits resulted from the alleged interference as was the case in *National Merchandising*. Here Holmes cannot establish such a causal nexus. As the holding of *National Merchandising* suggests, in the "interference with contract" context, disgorgement has been awarded only with respect to profits that the defendant would not have earned but for the interference.

Although damages for unjust enrichment may be available in a case such as *National Merchandising*, they are not available here. If it were to prevail at trial on its claim of tortious interference with contractual relations, Holmes would have an adequate remedy at law, i.e. a claim for lost profits. Moreover, even if there were no such legal remedy available to plaintiff, it would be unable to establish that Dana's profits on the sale of commodity lamps (something Dana had done successfully for ten years before Holmes entered the market) resulted from the interference. Summary judgment will therefore be entered for defendants on plaintiff's claim for unjust enrichment.

### B. *Defendants' Motion to Strike Testimony of Danny Lavy*

Danny Lavy's testimony, submitted by Holmes in the form of Lavy's affidavit, dated November 6, 1995, and his deposition, taken on June 14, 1996, provides, in large part, the basis for Holmes' RICO and antitrust claims against defendants. Defendants allege that Lavy is the sole source of the allegations set forth in paragraphs 22 and 24 of Plaintiff's Amended Complaint, that "Dana and Katz had warned and threatened Lau and Go–Gro not to sell Go–Gro's products to Elite Classics [Lavy's company]" and that "Dana ... and Katz, exerted great pressure on Handing Co., Ltd. [another Asian manufacturer] not to sell its products to Elite." Defendants move to strike Lavy's testimony not only because he has no first-hand knowledge of any acts done by the defendants that pertain

to those allegations but also because Lavy's testimony is hearsay.

While acknowledging that Lavy's testimony may be suspect, this Court declines to rule on its admissibility. Even if Lavy's hearsay testimony regarding statements made by the defendants to third parties were admissable and fully considered by this Court, Holmes has failed to meet its burden with respect to its antitrust and RICO claims to survive defendant's summary judgment motion and defendants' motion to strike will, therefore, be denied as moot.

### ORDER

For the foregoing reasons,

1. defendants' motion to strike the testimony of Danny Lavy is **DENIED** as moot;

2. defendants' motion for summary judgment with respect to the count for tortious interference with contractual relations is **DENIED**; and

3. defendants' motion for summary judgment with respect to the counts for violation of the federal antitrust law, violation of the Civil RICO statute, violation of M.G.L. c. 93A and for unjust enrichment is **ALLOWED.**

So ordered.