# United States Court of Appeals
## For the First Circuit

No. 00-1867

ALMA I. PEREZ ET AL.,
Plaintiffs, Appellants,

v.

VOLVO CAR CORPORATION,
Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Acosta,* Senior District Judge.

Gordon T. Walker, with whom Marc E. Sorini, Laura McLane, and McDermott, Will & Emery were on brief, for appellants.
Gael Mahony, with whom Alexander W. Moore, Shannon McCarthy Jandorf, Joseph C. Lyons, Hill & Barlow, Rubén T. Nigaglioni, Veronica Ferraiuoli Hornedo, Joanne Habib Figueroa, and McConnell Valdes were on brief, for appellee.

May 2, 2001

_____
*Of the District of Puerto Rico, sitting by designation.

**SELYA, Circuit Judge.** In this case, purchasers of certain Volvo automobiles claim that they were tricked into overpaying for their cars. The district court, referring to our decision in Bonilla v. Volvo Car Corp., 150 F.3d 62 (1st Cir. 1998), declared that the doctrine of res judicata barred this suit and granted the manufacturer's motion for summary judgment. Although we disagree with the district court's rationale, we affirm the entry of summary judgment on an alternate ground.

## I. BACKGROUND

The complaint in this case alleges that Volvo Car Corporation (a Swedish automobile manufacturer) acted in concert with Trebol Motors (its exclusive importer/distributor and principal dealer in Puerto Rico),[1] and other affiliated individuals and firms, to violate the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. The gravamen of the plaintiffs' complaint involves allegations that Volvo assisted in the commission of a series of fraudulent acts. This is essentially the same approach taken by the Bonilla plaintiffs in their earlier suit against Volvo, and the reader who desires more information about how the RICO statute operates

---

[1]Volvo actually dealt with two related entities, Trebol Motors Corporation and Trebol Motors Distributor Corporation. Because the distinction is immaterial here, we refer to these entities, collectively, as "Trebol."

-3-

in this context should consult that opinion. See Bonilla, 150 F.3d at 66-67.

In their third amended complaint, the Bonilla plaintiffs alleged five frauds. See id. at 67-75. This case is more narrowly focused. The particular fraud allegations that matter here are those that we previously characterized as involving double invoicing and disclosure labeling. Id. at 72-75. For present purposes, these merge into a single scheme, which we sometimes call "sticker fraud."

As Bonilla makes clear, id. at 72-74, this scheme had its genesis in the triangulation of the manufacturer-dealer relationship caused by the interposition of a Liechtenstein-based corporation, Auto und Motoren Aktiengesellschaft (AUM), into that relationship. AUM's ostensible role was as a guarantor of Trebol's debts to Volvo. The guarantee worked this way: when Trebol ordered motor vehicles, Volvo would ship them to Puerto Rico, sending duplicate invoices to both Trebol and AUM. AUM would pay Volvo. It also would re-invoice Trebol for the same vehicles, but at higher prices (ostensibly to cover AUM's "guarantee fee" and a smaller "processing fee").[2]

---

[2]Trebol actually remitted the higher amounts to AUM, resulting in the accumulation of a pool of excess funds in Liechtenstein. The plaintiffs allege that some of these funds were funneled back to Trebol or its principals. There is no proof, however, either that Volvo knew of any such kickbacks or

The instant case centers on the plaintiffs' allegation that the double invoicing permitted Trebol to misrepresent information on disclosure labels (commonly called "stickers") mandated by law. From 1972 to 1992, a Puerto Rico statute (Law 77) required automobile dealers to affix to each vehicle held for sale a label disclosing various kinds of data, including the name and address of the selling entity, the factory cost of the vehicle, and the "[r]etail price in Puerto Rico suggested by the seller." 23 P.R. Laws Ann. § 1023 (1987) (repealed 1992). A parallel federal law also required (and still requires) certain disclosures. See 15 U.S.C. §§ 1231-1233. The plaintiffs — Myrna Font, Angel Muñoz, Alma Perez, Venancio Rodríguez, María Rodríguez, Francisco Ramos, Marina Resto, Francisco Cortez, Ada Moreno, Efraín González, Migdalia Berdecia, José Colón, and Mirta Rivera[3] — are persons who purchased Volvo automobiles of the 700, 800, or 900 series in Puerto Rico on various dates ranging from 1985 to 1993. They maintain — as did the Bonilla plaintiffs, 150 F.3d at 72-74 — that AUM functioned primarily as a device to permit Trebol to boost the prices paid by consumers.

that Volvo officials received payments on the side.

[3]Certain of the plaintiffs are married to each other, and a number of conjugal partnerships also are designated as parties plaintiff.

Consistent with this theme, the plaintiffs aver that Trebol's stickers reflected artificially high "factory costs" and "manufacturer's suggested retail prices" because Trebol based those calculations on the inflated figures contained in the AUM invoices. They further allege that Trebol, which had copies of the original Volvo-prepared invoices, knew the actual figures and, consequently, knew that the posted sticker prices were false and misleading. For their part, the plaintiffs were exposed to, and duped by, the bogus cost figures displayed on the stickers of the cars that they bought, and were damaged in that those fraudulent misrepresentations marked the starting point for negotiations as to price and caused them to pay more than they otherwise would have.

Since Trebol has gone bankrupt and is no longer involved in this case, the plaintiffs' guns are trained on Volvo. They allege that Volvo knew of, and helped facilitate, Trebol's nefarious activities by, among other things, allowing Trebol to misrepresent its costs and condoning Trebol's arrangement with AUM even though Volvo knew that the guarantees issued by AUM were worthless. Volvo adamantly denies these accusations.

The district court stayed proceedings in this case pending resolution of the Bonilla appeals. That was prudent

because the Bonilla plaintiffs, comprising a class of persons who had purchased Volvo automobiles of the 200 series, had leveled virtually indistinguishable charges and, moreover, had prevailed at trial. Eventually, however, this court found, as a matter of law, that the Bonilla plaintiffs had offered insufficient evidence of Volvo's awareness of, or participation in, the ongoing fraud. See Bonilla, 150 F.3d at 72-76.[4] Volvo then moved for summary judgment in this case, alleging that here, as in Bonilla, the plaintiffs had failed to tie Volvo to the fraudulent scheme. The plaintiffs opposed the motion, but the district court granted it, adverting to our decision in Bonilla and invoking the doctrine of res judicata. The plaintiffs moved unsuccessfully for reconsideration and then filed this timely appeal.

## II. THE SUMMARY JUDGMENT STANDARD

---

[4]After mandate issued, the Bonilla plaintiffs docketed a motion in the district court entitled "Informative Motion Regarding Fraud by Volvo Sufficient to Warrant Further Discovery and Potentially Re-Open the Judgment." In support of this motion, they filed the Gonzalez affidavit, discussed infra Part IV(A). On April 16, 2001, the district court (Pieras, J.) granted the motion in part, allowing discovery to go forward on the issue of Volvo's alleged misconduct. The court specifically reserved decision as to whether it would (or could) reopen the judgment and order a new trial. Notwithstanding these ongoing proceedings, the Bonilla judgment may be regarded as final for res judicata purposes. See Cruz v. Melecio, 204 F.3d 14, 20-21 (1st Cir. 2000); see also 18 James Wm. Moore et al., Moore's Federal Practice §§ 131.20[2][c] (3d ed. 1999).

This appeal stems from an order granting summary judgment. Since we have written at length about the jurisprudence associated with that procedural device, e.g., McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 314-15 (1st Cir. 1995) (collecting cases), an outline suffices here.

A district court may enter summary judgment only to the extent that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact. Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000). In applying this screen, the court must construe the record and all reasonable inferences from it in favor of the nonmovant (i.e., the party opposing the summary judgment motion). Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). In this formulation, an absence of evidence on a critical issue weighs against the party — be it the movant or the nonmovant — who would bear the burden of proof on that issue

-8-

at trial.  See  Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35-36 (1st Cir. 1998); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990).

In appraising summary judgment orders, an appellate court applies essentially the same standards.  See Werme v. Merrill, 84 F.3d 479, 482 (1st Cir. 1996).  Withal, the appellate tribunal is not wed to the trial court's reasoning. Because appellate review is plenary, the court of appeals may, if the occasion arises, "reject the rationale employed by the lower court and still uphold its order for summary judgment." Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  In other words, we may affirm the entry of summary judgment on any ground made manifest by the record.  See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).

Against this backdrop, we divide the discussion that follows into two parts.  First, we examine the district court's stated rationale.  Finding that rationale unpersuasive, we address Volvo's alternate line of defense.

III.  THE DISTRICT COURT'S RATIONALE

As said, the district court decided this case on the basis of res judicata.  Federal law determines the preclusive effect of a judgment previously entered by a federal court.  See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d

26, 37 (1st Cir. 1998).  Under federal law, the doctrine of res judicata dictates that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  Allen v. McCurry, 449 U.S. 90, 94 (1980).  Three conditions must be met in order to justify an application of the doctrine:  "(1) a final judgment on the merits in an earlier suit, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two suits."  Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 755 (1st Cir. 1994).

The district court concluded that these conditions had been fulfilled.  As to the first two conditions, this conclusion is irreproachable:  Bonilla went to final judgment, and there is an apparent congruence between the causes of action asserted there and here.  The third condition, however, is not so easily overcome.

The lower court thought that the parties in the two cases — Bonilla and the case at bar — were to all intents and purposes identical.  But in arriving at this conclusion, the court mistakenly relied on a proposed description of the Bonilla class, derived from the Bonilla plaintiffs' complaint.  The proposal importuned the court to certify a class of plaintiffs

-10-

that included the named plaintiffs and "all other persons who, as a direct result of defendants' scheme, . . . bought or acquired from defendants motor vehicles of the Volvo model 240 GLE and/or any other Volvo model." Withal, the district court in Bonilla eschewed this proposal. Instead, it ultimately certified a narrower class composed of "all persons who purchased or acquired from any of the defendants from 1983 to the present, Volvo motor vehicles sold as, or represented to be, new or used 200 Series [vehicles]."

This deviation shrank the boundaries of the Bonilla class and, in the process, destroyed any basis for a claim that the Bonilla class encompassed the plaintiffs in this case (purchasers of Volvo motor vehicles in the 700, 800, or 900 series). The two groups are entirely separate and distinct. It follows inexorably that identicality of parties does not exist.

While this descriptive difference undermines the district court's stated rationale, it does not altogether preclude the possible applicability of res judicata. There are recognized proxies for identicality of parties, see Gonzalez, 27 F.3d at 757-63, and we briefly explore the record in an effort to detect their presence.

One such proxy arises when a party has had a "significant degree of effective control in the prosecution or

-11-

defense of the [earlier] case — what one might term, in the vernacular, the power — whether exercised or not — to call the shots." Id. at 758. No such control existed here. By definition, the plaintiffs in the two cases are owners of different models of automobiles. The one noteworthy commonality is that the same attorneys represented the plaintiffs in both cases. The law is settled, however, that the appearance of common counsel, without more, does not prove substantial control. Id. at 759.

The other possible proxy for identicality of parties is virtual representation. This looks promising at first blush. There is, in a sense, an identity of interests between the two sets of plaintiffs: both sued the same manufacturer for damages suffered as a result of the same alleged chicanery. In order for this proxy to pertain, however, there must be something more than a mere confluence of interests (or else, a manufacturer's successful defense of a product liability suit would bar other unrelated persons from pressing claims arising out of the same product defect). For nonparty claim preclusion to operate on this level, the party urging preclusion (typically, the defendant) must demonstrate, at a bare minimum, that the plaintiffs in the second suit had notice of, and an opportunity to participate in, the earlier suit. See id. at 761. Put

-12-

another way, the doctrine of virtual representation cannot be used to bar the claim of a person who was not a party to the earlier suit unless that person, at the least, had actual or constructive notice of the earlier suit and, thus, a chance to join it.[5]  See id.

The case at hand cannot qualify under this rubric.  The record does not suggest (and Volvo does not argue) that the Volvo owners here (purchasers of vehicles in Volvo's 700, 800, or 900 series) had either actual or constructive notice of the Bonilla litigation (brought by purchasers of Volvos in the 200 series).[6]  Hence, virtual representation is not a viable option here.

That ends this aspect of the matter.  There is no credible basis for applying res judicata principles in their

[5]We do not mean to suggest that notice of, and an opportunity to join, an earlier suit is all that is required for virtual representation.  These are, however, the most abecedarian requirements — and since they are not satisfied here, we need go no further.

[6]Although this case and the earlier case involved different vehicle models, one plaintiff — Efraín González — straddles both cases because he owned a Volvo of the 200 series as well as a Volvo of the 700 series.  We do not regard this minuscule overlap as significant.  González was not a named plaintiff in the Bonilla case, and the class notice that he received specifically stated that the suit involved only Volvos in the 200 series.  Nothing in the record suggests that he was put on notice that an adjudication of the claims before the Bonilla court would preclude later claims involving other Volvo automobiles.

classic iteration to bar the plaintiffs' suit. By like token, the facts necessary to support related theories of nonparty claim preclusion do not lurk in the penumbra of this record. Accordingly, we disavow the district court's stated rationale.

IV. **THE ALTERNATE LINE OF DEFENSE**

Volvo hypothesizes that it was entitled to brevis disposition on an alternate ground: insufficiency of the evidence. We test this hypothesis.

As we have said, the plaintiffs' claim against Volvo builds upon the RICO statute. Both sides agree that this claim depends, inter alia, on the plaintiffs' ability to show the conduct of an "enterprise" through a "pattern of racketeering activity." 18 U.S.C. § 1962(c). In turn, this requires a corollary showing of "at least two acts of racketeering activity" within ten years of each other. Id. § 1961(5). For summary judgment purposes, the plaintiffs have attempted to satisfy this "predicate act" requirement by proving numerous instances of mail and wire fraud. See id. § 1961(1)(B) (defining racketeering activities to include mail and wire fraud). As a practical matter, this strategic choice makes a showing of attribution — that is, Volvo's complicity in no fewer than two of the predicate acts — crucial to the success of the

-14-

plaintiffs' RICO claim.  See Bonilla, 150 F.3d at 66; Ahmed v. Rosenblatt, 118 F.3d 886, 888-89 (1st Cir. 1997).

To prove mail or wire fraud attributable to Volvo, the plaintiffs must adduce evidence of (1) a scheme to defraud; (2) Volvo's knowing and purposeful participation in the scheme, intending to defraud; and (3) the use of the mails or interstate wire or radio communication in furtherance of the scheme. Bonilla, 150 F.3d at 66; United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993); McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 790 (1st Cir. 1990).  Thus, in order to survive summary judgment, the plaintiffs must proffer competent evidence on each of these three elements — evidence which, when taken in the light most favorable to them, suffices to create a jury question.  This quantum of evidence is analogous to the quantum of evidence needed at trial to defeat a Rule 50 motion for judgment as a matter of law.  See Cont'l Grain Co. v. PRMSA, 972 F.2d 426, 431 (1st Cir. 1992).  Given that comparability, Bonilla (which was decided under the "judgment as a matter of law" standard) serves as a useful prototype for the inquiry we must undertake.

In Bonilla, 150 F.3d at 72-75, the plaintiffs' "sticker fraud" evidence was adequate as to the first and third elements, but fizzled on the second; we ruled that the evidence did not

support a finding that the acts of mail or wire fraud could be attributed to Volvo. Essentially the same evidence has been proffered here, and Volvo does not raise any questions of evidentiary sufficiency as to the first and third elements of the plaintiffs' prima facie case. We assume, therefore, that the record establishes trialworthy issues as to the existence of the "sticker fraud" scheme and the repeated use of the mails and international telephone lines to facilitate that scheme. Thus, we train the lens of our inquiry on the second element: Volvo's knowing and willful participation in the scheme (and its intent, if any, to defraud).

Bonilla decided, as a matter of law, that the plaintiffs there had offered insufficient evidence to implicate Volvo in the fraudulent scheme. See id. at 72-76. Although Bonilla has no res judicata effect here, see supra Part III, we nonetheless are bound to follow it, under principles of stare decisis, insofar as the record now before us does no more than replicate the same facts that were before us in Bonilla. See Stewart v. Dutra Constr. Co., 230 F.3d 461, 467 (1st Cir. 2000) (explaining the operation of stare decisis).

The plaintiffs do not quarrel with this concept, but, rather, point to new information concerning Volvo's role (information that was not before this court in Bonilla). This

-16-

new material comprises (1) the affidavit of Ricardo Gonzalez Navarro (Gonzalez), and (2) two internal Volvo e-mails. We consider these items sequentially, with a view toward determining whether, singly or in combination, they fill the void that the Bonilla court perceived.

### A.   **The Gonzalez Affidavit**.

To place the first of these items into perspective, it is helpful to understand its provenance. Gonzalez was a member of the family that owned and operated Trebol and, beginning in 1988, served as Trebol's general manager. When the Bonilla litigation began, Trebol, Gonzalez, and certain of Gonzalez's relatives were named as defendants, along with Volvo. Years of acrimonious pretrial proceedings ensued and, somewhere along the line, Gonzalez opted to depart for Spain. He did not testify in the Bonilla lawsuit.

Notwithstanding Gonzalez's absence (or, perhaps, because of it), the Bonilla plaintiffs prevailed at trial. They lost on appeal. Endeavoring to gain a new trial, they then "turned" Gonzalez and secured an affidavit from him (signed and sworn to on September 7, 1999) as part of a negotiated settlement of the pending lawsuits brought by the Bonilla plaintiffs against Gonzalez, his family members, and their business interests. The Bonilla plaintiffs' efforts to obtain

a new trial remain unresolved, see supra note 4, but the details need not concern us.

The plaintiffs here submitted the same affidavit — which we call "the Gonzalez affidavit" — as part of their opposition to Volvo's motion for summary judgment. Inasmuch as the affidavit was not before the court of appeals in Bonilla, it qualifies as new matter — but it is nonetheless controversial. Like dueling swordsmen, the parties thrust and parry concerning both the admissibility of this new matter and its probative force. Volvo asserts that the affidavit should not be considered at all because it does not conform to the requirements of the Civil Rules. Whatever portions of the affidavit avoid this objection, Volvo says, prove nothing of consequence. The plaintiffs counter that Volvo has forfeited any right to raise an objection because it did not move to strike the affidavit. In all events, the plaintiffs urge us to find that the affidavit both satisfies the baseline requirements for admissibility and proves a great deal.

In the interest of orderliness, we start our appraisal with the question of whether Volvo properly preserved its right to object to the statements contained in the Gonzalez affidavit. We then mull the admissibility of those statements. Finally, we assess their probative force.

**1. The Need for a Motion to Strike.** The law as to what is required to preserve a party's right to object to the admissibility of statements contained in an affidavit proffered in connection with a summary judgment motion is not crystal clear. The plaintiffs invite us to apply literally language lifted from one sentence in this court's opinion in Lacey v. Lumber Mutual Fire Insurance Co., 554 F.2d 1204, 1205 (1st Cir. 1977) (stating that, in such circumstances, a party "must move to strike an [allegedly violative] affidavit," and that "if he fails to do so, he will waive his objection," thus opening the door for the court, absent "a gross miscarriage of justice," to "consider the defective affidavit") (citations and internal quotation marks omitted). This invitation would, however, make matters murkier and, in the bargain, require us to ignore the Lacey court's reasoning. Accordingly, we decline the invitation.

Statements of law should be taken in context and applied in a practical, commonsense manner. We believe that what is required to preserve a party's rights vis-à-vis an allegedly deficient affidavit is for the dissatisfied party to (a) apprise the trial court, in a conspicuous manner and in a timely fashion, that she considers the affidavit defective, and (b) spell out the nature of the ostensible defects clearly and

-19-

distinctly.  Whether the dissatisfied party fulfills these requirements by means of a motion to strike or in some substantially equivalent way (say, by an objection or, as here, in a legal memorandum urging the granting of summary judgment notwithstanding the affidavit) is of little moment.

This rule is fully consistent with the Lacey court's reasoning.[7]  There the court's principal concerns plainly related to notice and fair play, not to the form which a challenge to an affidavit might take.  Thus, in explicating its rationale, the court stated:

> Were a summary judgment to be set aside [where no complaint about the affidavit was lodged in the district court], a party could play dog in the manger, making no response to a movant's affidavits with the chances of both . . . defeating the motion and, if unsuccessful, of later setting it aside.

Id.

The rule that, in summary judgment proceedings, something less than a formal motion to strike can suffice to preserve an objecting party's rights vis-à-vis a defective affidavit also finds favor in case law from other circuits.

---

[7]This consistency is adequately evinced by the Lacey court's citation, with approval, 554 F.2d at 1205, of Noblett v. General Electric Credit Corp., 400 F.2d 442, 445 (10th Cir. 1968), in which the Tenth Circuit hinged waiver in this sort of situation to a failure to make "a motion [to strike] or other objection" (emphasis supplied).

See, e.g., Williams v. Evangelical Ret. Homes, 594 F.2d 701, 703 (8th Cir. 1979); Associated Press v. Cook, 513 F.2d 1300, 1303 (10th Cir. 1975). Equally as important, the rule coheres with our post-Lacey jurisprudence. For example, in Maiorana v. MacDonald, 596 F.2d 1072 (1st Cir. 1979), we found an issue anent the form of affidavits preserved for review notwithstanding the defendant's failure to file a motion to strike. We premised our ruling on two facts: a codefendant had interposed a written objection to the challenged affidavits, and the district court had noted the ostensible defects and taken appropriate action. Id. at 1079 n.9; see also Davis v. Sears, Roebuck & Co., 708 F.2d 862, 864 (1st Cir. 1983) (suggesting, at least inferentially, that an oral objection would suffice to preserve such an issue for appeal).

We need not tarry. While Volvo did not move to strike the Gonzalez affidavit, it objected seasonably, strenuously, and specifically to critical portions of the affidavit on the ground that those excerpts violated Federal Rule of Civil Procedure 56(e). In that fashion, Volvo straightforwardly brought the claimed shortcomings in the affidavit to the district court's (and the plaintiffs') attention in a timeous manner. Given these detailed objections, we conclude that Volvo has

-21-

satisfactorily preserved its right to challenge the Gonzalez affidavit in this proceeding.

**2.    Admissibility.**    We next inspect the Gonzalez affidavit to determine the admissibility of the statements contained therein.  For ease in reference, we have reprinted the material portions of the affidavit as an appendix to this opinion.  In so doing, we have omitted paragraphs 21 through 27, all of which deal with aspects of the broader array of claims asserted by the Bonilla plaintiffs (the so-called "five frauds"), but not with the sticker fraud scheme.

The question of admissibility is governed by Rule 56(e).  That rule provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed. R. Civ. P. 56(e).  The rule requires a scalpel, not a butcher knife.  The nisi prius court ordinarily must apply it to each segment of an affidavit, not to the affidavit as a whole. Akin v. Q-L Invs., Inc., 959 F.2d 521, 531 (5th Cir. 1992) ("On a motion for summary judgment, the district court should disregard only those portions of an affidavit that are inadequate and consider the rest.").  We therefore take a

-22-

selective approach to the Gonzalez affidavit, intending to disregard those parts of it that are inadmissible and to credit the remaining portions.  See Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 682 (1st Cir. 1994).

In conducting this tamisage, personal knowledge is the touchstone.  See Sheinkopf v. Stone, 927 F.2d 1259, 1271 (1st Cir. 1991) ("It is apodictic that an affidavit . . . made upon information and belief . . . does not comply with Rule 56(e).") (citations and internal quotation marks omitted).  Of course, the requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise.  Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999).  While the line between facts and non-facts often seems blurry, courts nonetheless must strive to plot it.  Cf. Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989) (explaining, in the context of a motion to dismiss, that "facts are susceptible to objective verification" whereas conclusions "are empirically unverifiable in the usual case").

The Gonzalez affidavit is a mixed bag.  Some portions of it plainly meet the requirements of Rule 56(e), while others obviously do not.  For instance, Gonzalez's statements about his job responsibilities and Trebol's overall working relationship with Volvo (e.g., Appendix, ¶¶ 2, 3, 5) are based on personal

-23-

knowledge and, accordingly, are properly considered for summary judgment purposes. But his statements anent the origins of Trebol's relationship with AUM (Appendix, ¶ 7) are a different matter. Because the record makes manifest that the relationship began before Gonzalez became Trebol's general manager, his statements about the early years of the Volvo/Trebol/AUM arrangement cannot properly be considered.

This comparison illustrates the general nature of what must be done to separate wheat from chaff. We refrain, however, from classifying every statement in the Gonzalez affidavit. The proof of the pudding lies in those (relatively few) paragraphs which, if admissible, tend to prove Volvo's complicity in the sticker fraud. We turn, then, to those paragraphs, assuming, for argument's sake, that the remainder of the affidavit passes muster.

Paragraph 8 reads:

Volvo knew about the higher AUM invoice cost figures. From my personal discussions with various Volvo representatives, I know that Volvo was fully aware of the relationship between Trebol and AUM, including the nature and amount of the guarantees.

If admissible, these statements are little short of damning. We conclude, however, that they cannot be considered. Although the statements purport to be based on personal knowledge, they are totally lacking in specificity about the identity of the "Volvo

representatives" with whom Gonzalez ostensibly spoke, when those alleged conversations occurred, what was said, how Volvo "knew about the higher AUM invoice cost figures," and how Gonzalez "kn[e]w" the extent of Volvo's knowledge. Affidavits purporting to describe meetings or conversations need not spell out every detail, but to receive weight at the summary judgment stage they must meet certain rudiments. Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e), even when proffered in affidavit form by one who claims to have been a participant. See Jefferson Constr. Co. v. United States, 283 F.2d 265, 267 (1st Cir. 1960); Alger v. United States, 252 F.2d 519, 521 (5th Cir. 1958); see also 11 James Wm. Moore et al., Moore's Federal Practice ¶ 56.14[1][d] (3d ed. 1997) ("The affidavit, in addition to presenting admissible evidence, must be sufficiently specific to support the affiant's position.").

For similar reasons, we find the statements contained in paragraphs 9, 14, 16, and 20 of the Gonzalez affidavit to be insufficiently supported with particularized factual information. The same holds true for the last two sentences of paragraph 19. Although these statements purport to deal with Volvo's knowledge of ongoing events, they are conclusory rather

-25-

than factual.  See, e.g., Appendix ¶ 20 ("[T]here is no doubt that Volvo did in fact know of the stickers' contents.").  Such gauzy generalities are not eligible for inclusion in the summary judgment calculus.

We add a coda.  We think it bears mentioning that, in December of 1999 — three months after Gonzalez switched sides and executed the affidavit — the parties took his deposition in this case.  Although both sides offer an occasional reference to the deposition, the complete transcript is not part of the summary judgment record.  More importantly, the plaintiffs do not claim that Gonzalez, when deposed, divulged the specifics (names, dates, places, and the like) that are so conspicuously absent from his affidavit.  The plaintiffs' failure to fill the gaps in the Gonzalez affidavit, despite ample opportunity to do so, seals the deal.

**3.  Probative Value.**  We proceed at last to the question of whether the admissible portions of the Gonzalez affidavit (all the challenged statements other than those specifically proscribed above), when added to the proof marshaled at trial by the Bonilla plaintiffs, create a genuine issue of material fact anent Volvo's knowledge of the fraudulent scheme (and, thus, allow the plaintiffs to avert the swing of the summary judgment ax).  For the plaintiffs to achieve this

-26-

safe haven, the proof must consist of something more than grounds for suspecting that Volvo knew of the ongoing machinations. See Dow v. United Bhd. of Carpenters & Joiners, 1 F.3d 56, 58 (1st Cir. 1993) (holding that "unsupported speculation" will not suffice to block summary judgment); Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (same). The mustered evidence must be significantly probative of specific facts. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Sheinkopf, 927 F.2d at 1262.

The decisive question here reduces to whether the redacted Gonzalez affidavit, when married to the evidence adduced during the Bonilla trial, is "significantly probative" on the issue of Volvo's complicity in the fraud. We know from the surviving portions of the Gonzalez affidavit that Volvo had a close working relationship with Trebol, including frequent inter-staff communications; that Volvo representatives regularly visited Trebol's showroom in Puerto Rico (and from time to time saw stickers displayed on vehicles offered for sale); that Volvo executives periodically reviewed Trebol's financial statements; that Volvo knew of, and did not object to, the Trebol-AUM guarantee arrangement; that Volvo produced and sent to both AUM and Trebol original invoices for each motor vehicle shipped; that AUM, in turn, re-invoiced Trebol, invariably showing a

-27-

higher per-car dealer cost; that Volvo loaned AUM $2,700,000 in a three-way transaction among Volvo, AUM, and Trebol;[8] that Volvo representatives attended several meetings at which Trebol's entire cost structure (including the cost of the AUM guarantee) was discussed; and that Volvo officials offered Trebol their views as to acceptable pricing policies. Taken in the aggregate, this information fleshes out the scenario that was before the court of appeals in <u>Bonilla</u>, but adds nothing very substantial to it.

To be sure, the new material shows that Volvo was involved in some of the financial aspects of Trebol's business and that Volvo had the capability to discover the scam if it had sought to do so. But this is a fraud case, not a negligence case, and the new matter falls well short of proving that Volvo was aware of the fraud — let alone that Volvo participated in it or knowingly abetted it. The most that the redacted affidavit reveals is that Volvo knew certain cars were being priced higher because of a costly guarantee arrangement with a third party.[9]

---

[8]This transaction occurred in 1993, some eight years after the commencement of the guarantee relationship. By then, all the plaintiffs had purchased their Volvos. If the transaction proves anything, it tends to prove that Volvo did not know, even at that late date, that AUM was a dummy corporation. Elsewise, why would Volvo lend AUM so large a sum?

[9]We note that Gonzalez's carefully crafted affidavit never once says that any price-inflation practices actually were

With the other evidence of record, this may be enough to prove that Volvo condoned an inefficient business practice, but it is not enough to prove that Volvo knowingly condoned a fraud. Indeed, neither the Gonzalez affidavit nor any other piece of the plaintiffs' proof so much as suggests a reason why Volvo might have thought that the AUM guarantee was a tool to help Trebol bilk car buyers.

In sum, while the redacted Gonzalez affidavit provides more detail on some points, it is essentially cumulative of the evidence that was before the <u>Bonilla</u> court. Where, as here, the nonmovant has the burden of proof on a critical issue and the evidence that she proffers in opposition to summary judgment is so vague that she could not prevail at trial, the motion must be granted. See <u>Liberty Lobby</u>, 477 U.S. at 252; <u>Yusefzadeh</u> v. <u>Ross</u>, 932 F.2d 1262, 1264-65 (8th Cir. 1991); <u>cf.</u> <u>Smith</u> v. <u>F.W. Morse & Co.</u>, 76 F.3d 413, 425 (1st Cir. 1996) (holding that "a mere scintilla of evidence is not enough to forestall a directed verdict"). Because the Gonzalez affidavit is not significantly probative of Volvo's complicity in the ongoing sticker fraud scheme, the record still lacks evidence indicating that Volvo knowingly and willingly participated therein.

## B.  **The Internal E-mails**.

discussed with Volvo officials.

Our journey continues. After the district court granted summary judgment, the plaintiffs moved for reconsideration. They not only disputed the court's <u>res judicata</u> analysis but also cited, for the first time, two internal Volvo e-mails that discussed employees' concerns about the actual value of the AUM guarantee. The district court denied the motion without comment. The plaintiffs assign error, arguing (insofar as relevant to Volvo's alternate line of defense) that the e-mails make a dispositive difference on the issue of Volvo's knowledge of the fraud. Volvo says that the proffered e-mails are too late and, in all events, prove too little.

In the peculiar circumstances of this case, we reject Volvo's assertion that the plaintiffs proffered the e-mails too late. Although the e-mails were not called to the district court's attention until after the court had granted summary judgment, the plaintiffs seem relatively blameless. After all, Volvo did not produce the e-mails to the plaintiffs until January 2000 (the same month that Volvo filed its summary judgment motion) — and then only in Swedish. Given the timing, the sheer volume of documents involved in the case, and the need for translation, fundamental fairness counsels in favor of treating the e-mails as newly-discovered evidence within the purview of Federal Rule of Civil Procedure 59(e). <u>See</u> <u>Aybar</u> v.

-30-

<u>Crispin-Reyes</u>, 118 F.3d 10, 16 (1st Cir. 1997) (explicating the reach of Rule 59(e)).  Thus, timeliness is not a significant issue.

We likewise reject Volvo's suggestion that we should apply a deferential standard of review to the district court's denial of reconsideration.  Although we typically review a district court's disposition of a Rule 59(e) motion for abuse of discretion, <u>e.g.</u>, <u>Vasapolli</u> v. <u>Rostoff</u>, 39 F.3d 27, 36 (1st Cir. 1994), this is not the typical case.  The court below never really considered the contents of the plaintiffs' proffer, instead basing its denial of reconsideration on the mistaken belief that <u>res</u> <u>judicata</u> barred the action.  This was an error of law, subject to de novo review.

The question then becomes how best to remedy this error.  We could remand to allow the lower court to ponder the significance <u>vel</u> <u>non</u> of the e-mails, but we prefer, in the interests of judicial economy, to resolve a quintessentially legal judgment:  do the e-mails have enough probative value to ward off summary judgment?  If they do, then the error requires that we vacate the existing order for summary judgment.  If they do not, then any error in the denial of reconsideration was harmless.

The plaintiffs assert that the e-mails constitute "smoking gun" evidence of Volvo's culpability.[10]  We think that this colorful metaphor grossly overstates their probative force. The first e-mail, transmitted on September 12, 1991, reads as follows:

> Marie, the latest news is that the guarantee that [Volvo] has had for many years is valueless, we must have a discussion with Antonio Pauli [a Volvo representative whose responsibilities included dealing with Trebol] when he has returned!

The second e-mail, sent on October 2, 1991, reads as follows:

> The value of Trebol Motors' guarantee = 0.
>
> We have had a guarantee from a company in Liechtenstein (since 1986) that should cover our risks in P[ue]rto Rico, after studying this guarantee of payment, I can only come to the conclusion that, unfortunately, it is not worth more than paper it is written on!
>
> Before our next customer visit, we must take up the question of security of payment with Trebol Motors immediately.

The trail goes cold at this point; the plaintiffs have supplied no information as to what (if any) follow-up the e-mails generated.

While these e-mails, read in the light most favorable to the plaintiffs, show that some individuals at Volvo had concerns about the value of the AUM guarantee in 1991, they do

---

[10]The record contains competing translations of the e-mails. These differ slightly, but the differences are not material for our purposes.

not reflect knowledge on Volvo's part that AUM was part and parcel of an ongoing fraud. More importantly, even if Volvo had come belatedly to realize that AUM was a dummy corporation, the logical inference to be drawn was that AUM had been utilized either to dupe Volvo into extending credit to Trebol or to put funds beyond the reach of the tax collector. There is simply nothing in the e-mails that suggests an awareness on Volvo's part that AUM was being used as a mechanism to boost sticker prices artificially (and, thus, to swindle retail customers).

We need not probe this point more deeply. Because the e-mails, even when added to the <u>Bonilla</u> record and the admissible portions of the Gonzalez affidavit, are not significantly probative of Volvo's complicity in the sticker fraud, the district court's error in handling the motion for reconsideration was harmless.

## V. CONCLUSION

We need go no further. In this complicated case, the district court reached the correct destination, albeit by the wrong route. Even when one piles the admissible portions of the Gonzalez affidavit and the newly-discovered e-mails atop the record amassed in <u>Bonilla</u>, the total does not suffice to raise a genuine issue of material fact as to Volvo's knowledge of, or complicity in, the fraudulent scheme. Consequently, the plaintiffs cannot stave off Volvo's motion for summary judgment.

-33-

**Affirmed**.

**APPENDIX**

<u>SWORN STATEMENT OF RICARDO GONZALEZ</u>

[1] My name is Ricardo Gonzalez Navarro.  I am at least twenty-one years of age.  Except where specifically noted, I describe the facts set out below based upon my own personal knowledge.

[2] I serve as the General Manager of Trebol Motors Corporation and the General Manager of Trebol Motors Distributor Corporation (collectively "Trebol").  I have held those positions since 1988.  Prior thereto I worked at Trebol.  My family has been the 100% owner of Trebol since 1979.

[3] After 1984, Trebol has been an importer and retailer of Volvo automobiles.  Since 1988, I have been the Trebol employee with the most extensive relationship and contact with Volvo Car Corporation; maintaining that relationship is part of my job responsibility.

[4] Throughout the time that I have been responsible for Trebol's relationship with Volvo, officials of Volvo have possessed detailed knowledge of Trebol's importation and sales practices.  I have read, for example, [a district court opinion in the <u>Bonilla</u> case] which accurately discusses the very close relationship between Trebol and Volvo, including (as the opinion sets forth):  Volvo's assistance in advertising, training, and

financing; many trips by Volvo's representatives to Trebol and Trebols' representatives to Volvo; and other regular communications by fax and phone.

[5] It is fair to characterize Volvo's relationship with Trebol as an "open book" relation and very "hands on." Volvo was deeply involved in the entire process, all the way down to monitoring the status of vehicles "on the lot." Volvo's representatives specifically were very interested in and aware of Trebol's sales practices and finances. I want to specifically note that Volvo utilized its "open book" relationship and participated intimately in the decision-making process of the dealership. Indeed, when they wanted the final say on any matter, they had it and they exercised this power often. They specifically did review financial statements of Trebol.

[6] I discuss below Volvo's knowledge of certain specific conduct raised by the plaintiffs in these matters.

[7] AUM Guarantee: On or about July 1985, Trebol and Volvo arranged for a Liechtenstein company named Auto Und Motoren ("AUM") to serve as a "guarantor" of Trebol's payment obligations for new cars purchased by Trebol from Volvo for the 1986 model year and beyond. This relationship continued until approximately April 1995. As "guarantor", AUM received an

invoice for each Volvo car sold to Trebol (the "Volvo invoice") and issued a new, second invoice to Trebol for the same car (the "AUM invoice"). From the beginning of the relationship with AUM in or about July 1985 until June 1989 (approximately the end of the 1989 model year), every AUM invoice was substantially higher than the Volvo invoice as AUM included the "guarantee" fee in the cost figure of each AUM invoice. To the best of my knowledge, the "guarantee" fee for model years 1986, 1987, 1988 and 1989 was determined as a percentage of the CIF cost on each Volvo invoice — 15%, 20%, 25% and 10% respectively. AUM also charged a processing fee of approximately $25 per car for model years 1986-1989 and increased this fee progressively for later model years until it was approximately $200 per car for model year 1995.

[8] Volvo knew about the higher AUM invoice cost figures. From my personal discussions with various Volvo representatives, I know that Volvo was fully aware of the relationship between Trebol and AUM, including the nature and amount of the guarantees.

[9] Volvo knew that Trebol had a guaranty agreement with AUM, including the collateralization clause in the agreement and did not object to this agreement despite the fact that the original importer contract for the sale of Volvos in

-37-

Puerto Rico required that any payment guarantor be a Swedish bank, which AUM is not.

[10] In addition, in 1993, I discussed in person and through correspondence with Antonio Paulli and other Volvo representatives a $2.7 million loan transaction between Volvo, AUM and Trebol whereby Volvo loaned money to AUM to assist the payment obligations of AUM and Trebol. I signed this agreement on behalf of Trebol.

[11] Further, in 1995, I discussed in person and through correspondence an agreement entered into by Trebol and AUM whereby AUM agreed to swap Trebol's debt to AUM for equity with Antonio Paulli and other Volvo representatives. As part of this agreement, Trebol had to collateralize the Volvo franchise. Volvo was aware of this arrangement and did not object.

[12] Throughout my service as General Manager of Trebol, I know that Volvo representatives were aware of the amount of the AUM guarantee and the AUM invoices because I personally attended several meetings each year at which Trebol's entire cost structure — i.e., every cost from invoice cost to "cost build-up" (i.e., the costs of additions, taxes, warranty, etc.) to dealer profit — were discussed and factored into the retail price of each Volvo car sold in Puerto Rico. Included in the cost structure was the cost from the AUM invoice.

[13] Specifically, Trebol and Volvo held regular meetings, which I attended, which addressed Trebol's "cost build-up." These meetings occurred, at the very least, prior to each new model year, which required that new retail prices be determined. I discussed and debated specific amounts and costs with Volvo officials. Volvo made its view clear that certain prices were, or were not, acceptable from its perspective.

[14] . . . I can say with certainty, for the reasons described above, that Volvo did know of the AUM invoices and their contents.

[15] Lower prices meant greater sales volume and the AUM invoices added to the ultimate consumer price. The AUM relation was in place prior to my joining Trebol, so I do not have first hand knowledge. I know that my family and company derived no benefit from AUM commensurate with the extremely high guarantee cost per car.

[16] Volvo's representatives also knew and understood the contents of the retail "Law 77" stickers placed on the windows of new Volvo automobiles offered for sale in the Trebol showroom. The cost buildup was reflected on the face of the sticker Trebol placed on the window of each vehicle for sale.

[17] Volvo also assisted in sales training. Volvo was also involved in pricing, which also involved the information on the stickers.

[18] In addition, Volvo's practice was for its representatives to inspect the vehicles both in the showroom and on Trebol's lot and I am certain Volvo representatives have seen the Law 77 inspection stickers. I know that at least one of these representatives, Antonio Paulli, spoke Spanish. While in Puerto Rico, Volvo representatives also visited competitor's showrooms to gather information, which they could do effectively only if they could read competing Law 77 stickers, most, if not all, of which were also in Spanish. Moreover, Volvo representatives, over the years, attended meetings with local advertisers during which Spanish language advertising copies were reviewed and discussed and were regularly sent Spanish language copies of proposed advertisements to Sweden for review.

[19] When [a government agency] began to question the . . . sticker, I immediately wrote to Volvo because I believed they were aware of the sticker. Since Volvo organized Canada, USA and Puerto Rico as one business unit, I was referred by my contact at Volvo to Volvo North America (USA) for guidance on USA law and other Volvo concerns. This happened on more than one occasion. From my perspective, this was Volvo's

-40-

responsibility. This was Volvo's way of discharging its responsibility.

[20] . . . For the reasons just discussed, there is no doubt that Volvo did in fact know of the stickers' contents.