USCA1 Opinion

 

United States Court of Appeals

For the First Circuit

No. 01-1636

PURE DISTRIBUTORS, INC. D/B/A ENVION INTERNATIONAL

AND MATTHEW J. FREESE,

Plaintiffs, Appellants,

v.

CHRISTOPHER P. BAKER,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Cyr, Senior Circuit Judge.

 Elizabeth A. Bailey, with whom James E. Higgins and Sheehan
Phinney Bass + Green were on brief, for appellants.

 Barry S. Pollack, with whom Timothy C. Blank and Dechert Price &
Rhoads were on brief, for appellee.

April 9, 2002

 TORRUELLA, Circuit Judge. Appellants in this diversity 
action seek review of the district court's dismissal of their claim as
time-barred. The district court, in concluding that the appellants'
cause of action accrued more than three years prior to the initiation
of the present action, relied on certain inferences drawn from
pleadings filed by the appellants in an earlier lawsuit. Although we
believe that the pleadings in the other action might give rise to a
potent inference that the claim is untimely, there is at least a
reasonable basis for drawing a contrary inference. Because the summary
judgment standard requires that all reasonable inferences be resolved
in favor of the non-moving party, we conclude that the district court's
ruling on the statute of limitations was in error. Because we also
conclude that the district court's disposition cannot be sustained on
alternate grounds, we reverse.

I.

 Dr. Barry Sears ("Sears") is a biochemist and the inventor
of the popular "Zone" diet. In 1989, based on his research concerning
the relation between dietary intake and the production of certain
hormones, Sears developed a nutrition bar he dubbed the BioSyn Bar.

 In 1992, Sears founded Surfactant Technologies, Inc. ("STI")
to facilitate the development and distribution of various products,
including meal-replacement bars and specialty meals, associated with
his diet advice. After the formation of STI, Sears developed an
improved version of his BioSyn Bar, which he called the Eicotec Bar. 
At first, STI marketed its Eicotec Bar in national publications
directed toward elite athletes, such as swimmers and triathletes. 
Searching for a wider audience, Sears explored options for marketing a
modified version of the Eicotec Bar.

 While attempting to locate a distributor capable of marketing
his products to a broad consumer base, Sears met with appellants
Matthew Freese and Pure Distributors, Inc. (collectively "Pure"). 
Using a multi-level marketing model, Pure had been marketing a variety
of products since 1992 through an independent network of distributors. 
On October 20, 1993, STI and Pure entered into an agreement under which
Pure would acquire the exclusive marketing rights to all consumer
products developed by STI. In return, Pure agreed to pay Sears a 5%
royalty on all STI products sold pursuant to the agreement. Pure also
agreed to pay Sears $100,000 in exchange for the exclusive marketing
rights.

 The marketing agreement provided for one exception to Pure's
general exclusive marketing rights. Under that provision, Sears
retained the right to develop and sell certain products through
specialty medical centers, known as Eicotec Medical Centers. Though
the medical centers had not been created, the parties envisioned that
the they would be associated with medical care facilities, and would
only offer products for the medical treatment of patients requiring
sophisticated dietary programs and consultation. As such, the Eicotec
Medical Centers were not intended to compete with Pure's marketing
efforts or target its general retail and wholesale customer base.

 In April 1994, Pure began selling a consumer version of of
Sears's Eicotec Bar named the BioZone Bar. However, the relationship
between Sears and Pure appears to have been marked from the beginning
by tension and disagreement. Although Pure's sales of STI products
were substantial -- spurred on by the popularity of Sears's diet book,
The Zone, published in June of 1995 -- Sears complained that Pure had
yet to pay him any royalties on the sales. Sears also felt that Pure
was frustrating his ability to raise the capital necessary to develop
the Eicotec Medical Centers. Pure had apparently taken the position
that Sears's plan to market an enhanced version of Eicotec Bar through
the proposed medical centers would violate the parties' agreement
because the enhanced bars were essentially the same as, and would
therefore compete with, the bars developed for Pure.

 In March of 1996, Sears first met with appellee Christopher
Baker ("Baker"). At the time, Baker, who was the president of a small
investment firm, was scouting possibilities for a new business venture. 
During their first meeting Sears explained that he was interested in
establishing the Eicotec Medical Centers for the purpose of using his
diet products and advice for medical purposes.

 After their initial powwow, Baker and Sears met on several
occasions over the spring and summer of 1996. It is unclear from the
record whether Baker understood in the spring of 1996 the contours of
Sears's exclusive contractual arrangement with Pure. Nonetheless, over
the course of several months Baker and Sears endeavored to create
viable business plans and funding options for the creation of the
Eicotec Medical Centers.

 As Sears and Baker continued to seek funding sources for the
medical centers, the need to clarify the exact nature of Sears's
contractual obligations to Pure became paramount. On June 4, 1996,
Sears, Baker, and Pure met to discuss Sears's right to pursue the
proposal for marketing the enhanced Eicotec Bar and other products
through Eicotec Medical Centers. The precise give-and-take of the
meeting is not disclosed by the record, but it appears that Pure's
steadfast position was that any sale of the Eicotec Bar by Sears would
violate the marketing agreement. As a result, the parties did not
reach agreement on how, if at all, the plans of Baker and Sears could
move forward.

 Directly on the heels of the June 4 meeting, STI brought suit
against Pure in the United States District Court for the District of
Massachusetts ("the Surfactant action"). In its first claim for
relief, STI sought a declaratory judgment rendering the marketing
agreement inoperative. In the alternative, STI sought a declaration
that it had a right develop the Eicotec Medical Centers and distribute
its current products including the Eicotec Bar. STI also alleged,
among other things, that Pure unlawfully failed to pay royalties to STI
and Sears, notwithstanding the fact that over $30 million worth of
products covered by the parties' agreement had already been sold. In response, Pure asserted an eight-count counterclaim on
July 3, 1996, accusing Sears and STI of breaching the marketing
agreement and engaging in other wrongful conduct.

 On August 6, 1996, following Pure's assertion of the
counterclaim, Sears sent Pure a letter explicitly repudiating the
marketing agreement. Less than a week later, Eicotech Corporation
("Eicotech") was formally organized under the laws of Delaware. Sears
was named as the president of the corporation, and Baker was chief
executive officer and chairman of the board. Upon formation, Eicotech
began to directly market the Eicotech Bars and other products. (1)

 In December of 1996, Pure amended its pleadings to assert
claims against Eicotech, naming it as a defendant-in-counterclaim in
the Surfactant action. The gravamen of these claims was that Eicotech
had wrongfully induced Sears to abandon the distribution agreement by
urging him to use Eicotech as a vehicle to develop products that
compete directly with products marketed by Pure. In June of 1999, the
district court dismissed the claims against Eicotech on the grounds
that Eicotech was not formed as a corporate entity until after the
allegedly tortious conduct took place. (2)

 Two months after the dismissal of their claims against
Eicotech, Pure filed the present suit. In substance, the only
difference in the new suit is that Pure is now pursuing a claim of
intentional interference with contractual relations against Eicotech's
CEO, Baker, rather than against Eicotech itself. The suit, originally
filed in the state courts of New Hampshire, was removed to federal
court and summarily transferred to the District of Massachusetts
because it involved virtually the same claims alleged against Eicotech
in the Surfactant action.

 Following the transfer, Baker moved for dismissal or, in the
alternative, summary judgment. Baker's motion was premised on three
arguments: 1) that the dismissal of the Surfactant action barred the
present claim under principles of res judicata; 2) that Pure and Freese
could not establish the improper motive required for a claim of
intentional interference with contractual relations; and 3) that the
claim is barred by the three-year statute of limitations. The district
court rejected the first two arguments out of hand, reasoning that the
grounds for dismissal in the Surfactant action did not preclude a
second suit and that determinations of motive are not amenable to
resolution as a matter of law. The district court agreed, however,
that the action was time-barred. According to the district court, it
was apparent from appellants' pleadings in the Surfactant action that
Pure was aware or should have been aware of Baker's tortious conduct as
of July 3, 1996 -- three years and one month prior to the initiation of
their lawsuit.

 Following the dismissal of their case before the district
court, Pure timely filed the instant appeal.

II.

A.

 Although the district court's order appears to resolve the
case strictly on a motion to dismiss standard, both parties submitted
statements of fact and evidence of matters beyond the four corners of
the complaint, including deposition transcripts, copies of agreements,
and other materials. Thus, the motion is better "treated as one for
summary judgment and disposed of as provided in Rule 56." Fed. R. Civ.
P. 12(b); see also Davis v. Lucent Techs., Inc., 251 F.3d 227, 231 (1st
Cir. 2001).

 Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled to
judgment as a matter of law." Barbour v. Dynamics Research Corp., 63
F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). The
record evidence must be construed "in the light most favorable to, and
drawing all reasonable inferences in favor of, the nonmoving party." 
Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d
1, 5 (1st Cir. 2000). We review the district court's ruling on summary
judgment de novo. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33
(1st Cir. 2001).

B.

 A claim for intentional interference with contractual
relations is one sounding in tort. United Truck Leasing Corp. v.
Geltman, 551 N.E.2d 20, 21 (Mass. 1990). As such, it is subject to a
three-year statute of limitations under Massachusetts law. (3) Mass. Gen.
Laws Ann. ch. 260, § 2A (1992). The limitations period generally
begins to run at the time of the plaintiff's injury. Quinn v. Walsh,
732 N.E.2d 330, 332 (Mass. App. Ct. 2000). Since we take this case at
summary judgment, Pure bears the burden of producing competent evidence
demonstrating that its claim is timely. Kelly v. Marcantonio, 187 F.3d
192, 198 (lst Cir. 1999).

 In concluding that Pure's claims were time-barred, the
district court relied on allegations contained in Pure's July 3, 1996,
counterclaims in the Surfactant action. In particular, the district
court noted the following allegation in count II of the counterclaims: 
"Barry Sears . . . and STI have in fact developed, continue to help
develop and produce (on their own and with others) and market[]
competing nutrition, food, meal plans, customer support, cosmetic
products and other consumer products [in violation of the marketing
agreement]" (emphasis added). Taking the allegation's referencing of
"others" to denote Baker, the district court concluded that Pure was
aware of the basic facts underlying its claim by July 3, 1996, thereby
rendering its present claim, filed on August 2, 1999, time-barred.

 Pure complains that the district court misconstrued both the
allegations in the counterclaim and the law of intentional interference
with contractual relations. Pure asserts that the allegation of
contractual breach in count II of the July 1996 counterclaim dealt only
with a long-simmering dispute that had nothing to do with Baker or the
formation of Baker's company, Eicotech, as a vehicle for distributing
Sears's products. Specifically, Pure contends that count II arose in
the context of a running disagreement concerning Sears's alleged direct
sales of existing Eicotec Bars in violation of the marketing agreement.

 Pure contends further that, although it has admitted that
Baker and Sears were conniving at its expense as early as the spring of
1996, Baker's influence did not result in an actual breach of the
contract -- and therefore an actionable claim for intentional
interference -- until Sears formally repudiated the agreement with Pure
on August 6, 1996, a date falling narrowly within the limitations
period. See Fury Imports, Inc. v. Shakespeare Co., 625 F.2d 585, 588
(5th Cir. 1980) ("In order for the plaintiff to have a cause of action
for tortious interference of contract, it is axiomatic that there must
be a breach of that contract.") (emphasis added and quotation marks
omitted).

 The impoverished state of the record makes a determination
in this case difficult. The initial allegation of a breach of contract
involving the influence of "others" is rather bare-bones and could
plausibly be interpreted to refer to Baker's dealings with Sears. 
Indeed, as the complaint and counterclaims in the Surfactant action
followed the doomed meeting of June 4, 1996, in lockstep, the timing of
Pure's allegation is highly suggestive of such a conclusion. 
Nonetheless, the strength of this inference, which the district court
drew in favor of the defendant in granting summary, is not irrefragable
proof that would bar Pure's claim. Pure's contention that the
allegations in the counterclaim referred only to an ongoing dispute
over Sears's direct sales of the Eictotec Bar as a method of raising
capital for the Eicotec Medical Centers is also a reasonable, if
somewhat less plausible, interpretation of the pleadings in the
Surfactant action. (4)

 The record is simply in need of greater factual development. 
Further discovery may demonstrate conclusively that the reference to
"others" in the July 1996 counterclaim was intended to denote Baker. 
Further discovery may also establish that, as the district court
surmised, Sears's "letter of August 6, 1996, disavowing the contract .
. . came well after the point at which [Pure] considered the rupture
[of their agreement] to be permanent." We therefore emphasize that
Baker should not hesitate to renew his motion for summary judgment, if
appropriate, on a fuller record. But at this point, we cannot,
consistent with summary judgment protocol, indulge the favorable
inferences that would bar Pure's claim.

C.

 "[W]e may affirm the judgment on any independently sufficient
ground squarely presented to us and to the district court." SEC v.
Sargent, 229 F.3d 68, 75 (1st Cir. 2001). Thus, Baker ask us to affirm
the lower court's dismissal of Pure's claim on either of two grounds
rejected by the district court.

 We first address Baker's argument that, under the doctrine
of res judicata, Pure's earlier suit against Eicotech forestalls the
present action. "Three conditions must be met in order to justify an
application of the [res judicata] doctrine: '(1) a final judgment on
the merits in an earlier suit, (2) sufficient identicality between the
causes of action asserted in the earlier and later suits, and (3)
sufficient identicality between the parties in the two suits.'" Pérez
v. Volvo Car Corp., 247 F.3d 303, 311 (1st Cir. 2001) (quoting González
v. Banco Cent. Corp., 27 F.3d 751, 755 (1st Cir. 1994)).

 Baker's argument falters at the first hurdle. Here, there
is no question that the ruling against Pure in the Surfactant action in
not a final judgment on the merits in the sense that it may be appealed
under 28 U.S.C. § 1291. The remaining claims in that action are
awaiting trial, and the district judge, in dismissing Pure's claims,
did not enter judgment in favor of Eictoech in accordance with Rule
54(b). As such, the dismissal of Pure's claims remains "subject to
revision at any time before the entry of judgment adjudicating all the
claims and the rights of all the parties." Fed. R. Civ. P. 54(b).

 Conceding the absence of true final judgment on the merits,
Baker nonetheless asks us to construe the finality requirement for
claim preclusion liberally to encompass the district court's earlier
dismissal of the claims against Eicotech. While there is some
distinguished authority for such a proposition, see 18 Charles Alan
Wright & Arthur R. Miller, and Edward H. Cooper, Federal Practice &
Procedure § 4432, at 302 (1981), we have declined to adopt a more
expansive view of finality in the context of claim preclusion unless
"very unusual circumstances" so warranted. (5) O'Reilly v. Malon, 747 F.2d
820, 822 (1st Cir. 1984). And we find nothing so unusual about the
circumstances present here that would compel us to depart from our
traditional approach. See Clauson Co. v. Dynatron/Bondo Corp., 889
F.2d 459, 465-66 (3d Cir. 1989) (holding that summary judgment as to
one of plaintiff's claims did not support res judicata in the absence
of entry of judgment pursuant to Rule 54(b)); Senza-Gel Corp. v.
Seiffhart, 803 F.2d 661, 667 (Fed. Cir. 1986) (same); United States v.
Arkansas, 791 F.2d 1573, 1576 (8th Cir. 1986) (same). Indeed, in this
case some of the concerns that might favor application of res judicata
are mitigated by the fact that both actions are pending before the same
district judge, who can police any possible unfairness arising from the
concurrent proceedings.

 This is not to say that we admire, or even condone, Pure's
decision to create potentially duplicative proceedings by filing the
present action. An approach more considerate of judicial economy would
have entailed a simple request on Pure's part to amend the pleadings in
the Surfactant action to add Baker as a party. See Fed. R. Civ. P. 21. 
Thus, if final judgment is entered in the Surfactant action during the
course of this case, nothing in our opinion should be construed to
prevent Baker from renewing his res judicata arguments. (6)

D.

 With regard to the second alternate ground upon which Baker
asks us to affirm, he argues that Pure has failed to adduce evidence
supporting an element of its claim for intentional interference with
contractual relations. Pure is required to establish four elements to
succeed on its claim: "(1) the existence of a contract or a business
relationship which contemplated economic benefit; (2) the defendant['s]
knowledge of the contract or business relationship; (3) the
defendant['s] intentional interference with the contract or business
relationship for an improper purpose or by improper means; and (4)
damages." Swanset Dev. Corp. v. Taunton, 668 N.E.2d 333, 338 (Mass.
1996).

 Baker contends that Pure has failed to allege or adduce
evidence of conduct that could be construed as improper in either
motive or means. According to Baker, the allegations and evidence in
this case, even when viewed in the light most favorable to Pure,
suggest only that Baker was engaging in honest, albeit hard-nosed,
competition in the pursuit of his own financial interests. In other
words, Baker contends that his conduct must be viewed as lawful so long
as it constitutes merely "competing for the prize." Holmes Prods.
Corp. v. Dana Lighting, Inc., 958 F. Supp. 27, 32 (D. Mass. 1997).

 Determining whether the alleged tortfeasor's interference
with a contract is improper is a context-sensitive inquiry that must be
evaluated on a case-by-case basis. G.S. Enters., Inc. v. Falmouth
Marine, Inc., 571 N.E.2d 1363, 1370 (Mass. 1991); see also Restatement
(Second) of Torts § 767 (1979) (setting forth multiple factors to be
considered in determining whether interference is improper). As the
Massachusetts Appeals Court has observed, "[i]t is one thing to lure a
customer away from someone with whom it has been doing business by
means of better product, service, or prices but quite another to abet
the repudiation of solemn contractual obligations of which the party
interfering is well aware." Melo-Tone Vending, Inc. v. Sherry, Inc.,
656 N.E.2d 312, 315 (Mass. App. Ct. 1995). Given the sparse state of
the record, we think the district court was correct to reserve judgment
on whether Baker's activities crossed the line.

III.

 In sum, we conclude that the district court erred in granting
judgment in favor of the appellee based on the statute of limitations. 
Further, we find that neither of the alternative grounds urged by
appellee can sustain the district court's dismissal.

 Reversed.

1. To date, Eicotech has not established any of the Eicotec Medical
Centers.
2. Although the district court dismissed the claims involving Eicotech,
much of the remaining case between Pure and STI is still awaiting
trial.
3. The district court applied Massachusetts law to the statute-of-limitations question. On appeal, Pure suggests that this issue and
others may be governed by New Hampshire law. Since New Hampshire law
also provides for a three-year limitations period, N.H. Rev. Stat. Ann.
§ 508:4(I) (1997), we see no conflict of law that would necessitate our
choosing between the two. See Lambert v. Kysar, 983 F.2d 1110, 1114
(1st Cir. 1993) (noting that conflict-of-law analysis is unnecessary
where the "outcome is the same under the substantive law of either
jurisdiction"). Moreover, we see no indication that Pure flagged the
choice-of-law question before the district court; we therefore deem the
issue waived for purposes of this appeal. Arrieta-Giménez v.
Arrieta-Negrón, 859 F.2d 1033, 1037 (1st Cir. 1988).
4. Pure's interpretation of the counterclaim is buttressed by another
section of Pure's pleadings in which it accuses Sears of "continuing to
sell [his] consumer products through direct mail and direct sales."
5. Finality may, however, be understood more broadly when analyzed in
the context of issue preclusion, as opposed to claim preclusion. See
Restatement (Second) of Judgments § 13 (1982) ("[F]or purposes of issue
preclusion (as distinguished from merger or bar), 'final judgment'
includes any prior adjudication of an issue in another action this is
determined to be sufficiently firm to be accorded preclusive effect.").
6. Because we have no final judgment on the merits for the purposes of
claim preclusion at this time, we need not address the subsidiary
questions of whether the prior action involved sufficiently identical
claims and parties.