Asselin v. Waldron                    CV-02-330-M    01/13/04

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Holly Asselin,
      Plaintiff

      v.                                    Civil No. 02-330-M
                                            Opinion No. 2004 DNH 011
Daniel E. Waldron;
xWave, New England, Inc.;
and xWave, Inc.,
      Defendants


**O R D E R**


     Given prior rulings, this case now consists of Holly

Asselin's Title VII claim against former employer(s) xWave, New

England, Inc. and xWave, Inc. (collectively "xWave"), plus her

claim of intentional infliction of emotional distress against

xWave officer Daniel Waldron.  Before the court are defendants'

combined motion for summary judgment (document no. 9) and motions

to strike three affidavits filed in support of plaintiff's

objection to summary judgment (document nos. 16, 17, and 18).

For the reasons given below, the motion to strike the affidavit

of Tieran Kennedy is granted in part, and the motion for summary

judgment is granted.

**Motions to Strike**

Defendants move to strike all three affidavits submitted by plaintiff in support of her opposition to summary judgment. Affidavits were executed by the plaintiff, and by Warren Treuhaft and Tieren Kennedy. Defendants object to statements in Asselin's affidavit on grounds that they contradict statements she made in her deposition, and they object to various statements in all three affidavits on grounds that they fail to comply with FED. R. CIV. P. 56(e) because: (1) they are speculative or conclusory rather than factual; (2) they are not based upon personal knowledge; or (3) the affiant has failed to "show affirmatively that [he or she] is competent to testify to the matters stated therein."

Rather than striking any affidavit in its entirety, the court will apply the Rule 56(e) inquiry to each segment of each affidavit, will "disregard only those portions . . . that are inadequate and [will] consider the rest." Perez v. Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001) (quoting Akin v. Q-L Invs., Inc., 959 F.2d 521, 531 (5th Cir. 1992)). Moreover, with

2

one exception, there is no need for a separate, paragraph by paragraph analysis of the three affidavits.

The one exception concerns Asselin's allegation of workplace hostility directed toward her by xWave employees other than Waldron.  In her complaint, Asselin asserts that:

> Shortly after [her] hiring, Waldron made inappropriate sexual comments of a base and vulgar nature to other male employees, to the effect that [Asselin's] "physical attributes," understood to mean [her] breasts, would help her sell.
>
> . . .
>
> Waldron continued to make inappropriate sexual comments of a base and vulgar nature about [Asselin] to several other, primarily male employees, commenting on [her] breasts, cleavage, and her work attire. . . .
>
> . . .
>
> Waldron continued making inappropriate comments of a sexual nature about [Asselin] to other co-workers, and as a result, these employees did not take her seriously or treat her in a professional manner.  For example, many of the male employees to whom Waldron made said comments were employed in the group which was responsible for ordering hardware for the Account Representatives customers, and with whom the account representatives had to interface in order to serve their clients.
>
> As a direct result of the comments Waldron made to other male employees, said male employees began to

> treat [Asselin] in a crude and unprofessional manner, and as a result, [she] was unable to perform her job.

(Compl. ¶¶ 7, 9, and 14-15.)

In an affidavit submitted in support of her objection to summary judgment, Asselin contends that a trialworthy issue exists regarding the treatment she received from xWave employees other than Waldron:

> . . . Because the technical support staff did not take me seriously as a professional due to Mr. Waldron's instigation of and failure to curtail the jokes and ridicule about my physical attributes, I was met with resistence whenever I tried to talk and meet with the technical support staff in order to facilitate delivery of the necessary hosting and software for the [Foss] project. As a result of this resistence, I had to ask Mr. Gallagher to transmit communications between myself and technical support.
>
> . . .
>
> The technical support staff did not take me seriously despite the fact that I was qualified and competent to do my job, and was doing my job well. In the absence of the resistence with which I was met when trying to coordinate with technical support and executives on certain accounts, I believe I would have met or exceeded the end of year sales goals set for me despite the fact that I was working in an undeveloped territory.
>
> . . .

4

> Mr. Waldron and the male co-workers treated me differently with respect to work privileges and task assignment, which I learned was based on the discriminatory ridicule of which I was a target.
>
> . . .
>
> The pervasively hostile and abusive atmosphere created by the resistance to which I was subjected frustrated my ability and efforts to perform my job with the company. I subsequently learned that this resistence was due to me being an object of ridicule due to the inappropriate and extreme jokes, comments, [and] ridicule made about the physical attributes I possess as a woman.

(Asselin Aff. ¶¶ 4(f), 5(g), 11, and 14.)

Presumably because she was not present for any of the conversations during which Waldron allegedly discussed her physical attributes with male co-workers, Asselin also offers the affidavit of Tieren Kennedy, who reports the following incidents involving comments about Asselin or attitudes toward her:

> Ms. Asselin's breasts were the standing joke among the male employees of xWave including the developers and business analysts. The male co-workers would talk and laugh about the size of Ms. Asselin's breasts whenever her name came up regarding a client account, when she was expected to stop by the office, and just after she left the office. Such conversations and jokes focused on Ms. Asselin's breasts and were made at least once a week. Mr. Waldron participated in these jokes with the male co-workers when he was in the office with them.

> The male co-workers would make jokes about Ms. Asselin's personal relationship with her boyfriend. They would also joke about what might occur if Ms. Asselin were to have [a] sexual relationship with a man in the office.
>
> The male co-workers and executives obsessed about the size of Ms. Asselin's breasts and the jokes made about Ms. Asselin's breasts and personal relationship with her boyfriend led to resistance to what Ms. Asselin was trying to do as a professional. The people with whom Ms. Asselin had to interact in order to accomplish her job treated her as an object of ridicule.
>
> . . .
>
> The technical support staff did not take Ms. Asselin seriously despite the fact that she was a good worker and was qualified and more than competent to do her job.

(Kennedy Aff. ¶¶ 4(a)-(c) and (g).) Asselin concededly did not learn of the conduct discussed in ¶¶ 4(a)-(c) until after she had resigned from xWave. (Asselin Aff. ¶ 5(j).)

It is evident that for Asselin to prove that Waldron poisoned her working environment, by inappropriately calling attention to or ridiculing her physical attributes with her co-workers, she must produce some evidence from which a reasonable jury could resolve that claim in her favor. The only evidence she has offered on summary judgment is that contained in

6

Kennedy's affidavit.  Defendants argue that: (1) paragraphs 4(a)-(c) and (g) should be stricken from Kennedy's affidavit because she does not affirmatively demonstrate her competence to testify as to the matters discussed therein; (2) paragraphs 4(c) and (g) should be stricken because the assertions made are speculative and conclusory rather than factual; and (3) paragraphs 4(a)-(c) should be stricken for lack of specificity.

Paragraphs 4(a)-(c) must be disregarded because they are not specific enough to create a triable issue.  As the court of appeals has explained, "[s]tatements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e), even when proffered in affidavit form by one who claims to have been a participant."  Perez, 247 F.3d at 316 (citing Jefferson Constr. Co. v. United States, 283 F.2d 265, 267 (1st Cir. 1960); Alger v. United States, 252 F.2d 519, 521 (5th Cir. 1958); 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.14[1][d] (3d ed. 1997)).  Here, paragraphs 4(a)-(c) are no more specific than the material disregarded in Perez.  Those paragraphs identify neither discrete conversations nor individual participants.  Thus, they do not

7

assert "facts . . . susceptible to objective verification." Perez, 247 F.3d at 316 (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989)).  For example, it would be difficult to objectively verify that Asselin's breasts were a "standing joke."[1]  Moreover, even if objective verification were possible, when the participants in the offending conversations are all unnamed, it is difficult to imagine how defendants could mount a meaningful defense to plaintiff's allegations, or challenge her proof.  Given the absence of specificity, which is necessary to create objectively verifiable assertions, paragraphs 4(a)-(c) must be disregarded.

Without paragraphs 4(a)-(c), there is no factual basis for Asselin's conclusory assertion that her co-workers treated her badly because Waldron had made inappropriate comments to them about her breast size.  Thus, Asselin's Title VII claim stands upon the things Waldron allegedly said and did in Asselin's presence, along with the one comment he made about Asselin to Kennedy and Treuhaft.

---

[1] Of course, one could objectively verify that one or ten or twenty jokes were made about Asselin's breasts, but whether her breasts were a "standing joke" is a matter of opinion rather than a matter of fact.

8

**Motion for Summary Judgment**

I.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact."  <u>Perez</u>, 247 F.3d at 310 (citing <u>Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.</u>, 232 F.3d 8, 14 (1st Cir. 2000)).

> Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine."  In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

<u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995)).

9

In defending against a motion for summary judgment, "[t]he non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for trial." Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001) (citing Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174 (1st Cir. 1994)). When ruling upon a party's motion for summary judgment, the court must "scrutinize the summary judgment record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Navarro, 261 F.3d at 94 (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

II. Background

The facts of this case, presented in the light most favorable to the non-moving party, are as follows.

On June 5, 2000, Holly Asselin was hired as a sales representative by a company named TechKnowledge. As a TechKnowledge employee, Asselin reported to Tieren Kennedy, who reported to Warren Treuhaft, who reported to Daniel Waldron. (Asselin Aff. ¶ 1.) TechKnowledge was acquired by xWave, and

10

Waldron continued with xWave, exercising general supervisory oversight over Asselin. (Asselin Aff. ¶ 2.) While employed by xWave, as a junior account executive, Asselin was directly supervised by Elaine McKinnon, then by Mark Gallagher, and finally, by Waldron himself. (Asselin Aff. ¶ 2.) Waldron became Asselin's direct supervisor on June 22, 2001.

Before she came under Waldron's direct supervision, Asselin worked both in the office, developing leads over the telephone, and outside the office, making sales calls on potential customers. (Asselin Aff. ¶ 3.) When Waldron took over as Asselin's supervisor, he narrowed her duties, directing her not to make in-person sales calls, but to concentrate on developing leads over the telephone. (Asselin Dep. at 65-80, 141; Asselin Aff. ¶ 4(g).) Asselin characterizes that shift in duties as a demotion. (Asselin Dep. at 73, 75, 76, 77, 80, 81, 93, 144, 153; Asselin Aff. ¶ 4(g).) However, she retained the same title, and her compensation was not affected. (Asselin Dep., Exs. 3,4, and 7.) Asselin complained about the shift in her duties, and was allowed to go out on sales calls again. (Asselin Dep. at 75-76, 77, 77-78, 142-43; Asselin Aff. ¶ 4(g).)

11

Asselin subsequently resigned from xWave, effective July 15, 2001. Upon announcing her decision to resign, she was presented with a severance agreement (Asselin Dep., Ex. 8) which she refused to sign, because it included a release of all claims against xWave. (Asselin Dep. at 85-89, 153-154; Asselin Aff. ¶ 6.) The release clause was deleted (Asselin Dep. at 90-91; Asselin Aff. ¶ 6), and Asselin signed an amended severance agreement (Asselin Dep., Ex. 10).

For the first several months of her employment, Asselin worked out of an office in Portland, Maine. (Asselin Dep. at 25.) Then she transferred to the Portsmouth, New Hampshire, office, where she worked until she resigned. During the full course of Asselin's employment, Waldron worked out of an office in Augusta, Maine. (Asselin Dep. at 24, 172.) While Asselin was working in Portland, Waldron visited weekly. (Def.'s Mot. Summ. J., Ex. 3.) Waldron visited the Portsmouth office three or four times while Asselin was working there. (Def.'s Mot. Summ. J., Ex. 3.) In addition, Asselin made approximately ten visits to the Augusta office where Waldron worked. (Def.'s Mot. Summ. J., Ex. 3.) She was also in Waldron's company during sales trips to

12

Manchester, New Hampshire, and on a three-day trip to Canada for an xWave meeting. (Def.'s Mot. Summ. J., Ex. 3.)

While she was employed by TechKnowledge and/or xWave, Asselin had the following specific encounters with Waldron. While driving either to or from a sales meeting at PSNH during the fall of 2000 with both Asselin and Tieren Kennedy, Waldron told Asselin that xWave had landed the PSNH account because of her sexy voice. (Asselin Dep. at 94-98, 117-18, 144, 153; Asselin Aff. ¶ 4(d).) Waldron also asked Asselin, who was riding in the front passenger seat, to clean his eyeglasses, remarking that his wife often performed that task for him. (Asselin Dep. at 94-96, 118, 144, 153; Asselin Aff. ¶ 4(c).) Also on that trip, when Asselin asked Waldron for a company cellphone, he declined to give her one, telling her that she would only use it to call her boyfriend. (Asselin Dep. at 154-156; Asselin Aff. ¶ 4(e).)

On another occasion during the spring of 2001, when Asselin was in Augusta on other xWave business, Waldron told her to help a female office assistant hand out name tags at a sales meeting,

while a male account executive was allowed to mingle with the customers attending the meeting. (Asselin Dep. at 99-113, 126-27, 139-41, 143-44, 153; Asselin Aff. ¶ 4(a).) At some point during the winter or spring of 2001, while at lunch with Asselin and two other xWave employees, Waldron stated that he liked to hire women. (Asselin Dep. at 114, 118.)

In addition to the instances of direct contact between Waldron and Asselin mentioned above, Waldron commented on Asselin's physical appearance to Warren Treuhaft and Tieren Kennedy, immediately after interviewing Asselin for her job with TechKnowledge. Waldron said that he would like to have a good-looking female around. (Treuhaft Aff. ¶ 2(a).) According to Kennedy, Waldron stated that Asselin "ha[d] the assets for the job" while gesturing toward his own chest in a manner suggesting he was commenting on the size of Asselin's breasts. (Kennedy Aff. ¶ 3(b).) Asselin did not learn of Waldron's comment until after she had resigned from xWave. (Asselin Aff. ¶ 5(j).)[2]

---

[2] In her deposition, Asselin also states that Kennedy told her, after she left xWave, that Waldren had directed her (Kennedy) to instruct Asselin to dress in a more businesslike fashion. (Asselin Dep. at 120-21, 127-28, 131.) Kennedy never carried out that directive. (Asselin Aff. ¶ 16.)

Based upon the foregoing, Asselin filed suit in seven counts.  Early in the litigation, she narrowed the suit to a Title VII claim against xWave (Count I) and a claim of intentional infliction of emotional distress against Waldron (Count VII).  (See document no. 7.)

Plaintiff's Title VII claim appears to be two-fold. Unequivocally, Asselin asserts that she was subjected to sexual harassment in the form of a hostile work environment.  She also claims to have been demoted and that her demotion compelled her to leave her position with xWave.  What is unclear in plaintiff's pleadings is whether she is asserting a claim that her demotion was an independently actionable gender-based adverse employment action, or was, instead, merely an incident contributing to the hostile work environment she alleges.  Construing the complaint in the light most favorable to plaintiff, the court assumes that she is raising both a hostile work environment claim and an adverse employment action claim.

III. Discussion

    A.    Title VII

        1.    Adverse Employment Action

"Title VII of the Civil Rights Act of 1964 provides that it is an 'unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's . . . sex." Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 436 (1st Cir. 1997) (quoting 42 U.S.C. § 2000e2(a)(1)). However, not every gender-based adverse employment action is actionable under Title VII; the employer's action must significantly affect the conditions of the plaintiff's employment. Under Title VII, a cognizable "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); cf. Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002) (citing Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996)); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23-25 (1st Cir. 2002).

16

Here, the limited narrowing of plaintiff's job duties does not qualify as a cognizable adverse employment action. Perhaps more importantly, that limitation was in effect for no more than eight days before it was rescinded. (Asselin Aff., Exs. 6 and 7.) It involved no reduction in pay or benefits and no change in title. As a matter of law, plaintiff's eight-day change in duties was a "minor change[] in working conditions . . . [that] does not constitute an adverse employment action." Marrero, 304 F.3d at 23 (citations omitted). Accordingly, if plaintiff has, in fact, asserted a Title VII adverse employment action claim based upon the claimed demotion, defendants' motion for summary judgment is granted as to that claim.

Asselin also appears to argue that she was compelled to leave her employment at xWave because of the alleged demotion. It is unclear precisely how her decision to leave xWave relates to her Title VII claim, especially in light of her decision to dismiss her state-law claims for constructive discharge and wrongful termination. If Asselin is arguing that her departure from xWave was a constructive discharge within the meaning of Title VII and was, on that basis, an actionable adverse

17

employment action, that claim fails as a matter of law. "'[C]onstructive discharge' usually describes harassment so severe and oppressive that staying on the job while seeking redress is intolerable." Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 10 (1st Cir. 2001) (citing Landrau-Romero v. Banco Popular De P.R., 212 F.3d 607, 611 (1st Cir. 2000); Ramos v. Davis & Geck, Inc., 167 F.3d 727, 732-33 (1st Cir. 1999)). It is difficult to see how plaintiff can argue that a reasonable person would have found it intolerable to remain an xWave employee while seeking redress when, in fact, she resigned approximately two weeks after she persuaded Waldron to rescind the prohibition against her making in-person sales calls. That is, Asselin did seek redress while staying on the job, and she did so successfully. Thus, if plaintiff means to assert a Title VII claim based upon a constructive discharge resulting from her "demotion," defendants' motion for summary judgment is granted as to that claim as well.

### 2. Sexual Harassment – Hostile Work Environment

"Courts have long recognized that sexual harassment is 'a form of gender discrimination prohibited by Title VII [of the

18

Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).'" O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (quoting Provencher v. CVS Pharmacy, 145 F.3d 5, 13 (1st Cir. 1998)). In addition to prohibiting quid pro quo sexual harassment, "Title VII also allows a plaintiff to prove unlawful discrimination by showing that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" O'Rourke, 235 F.3d at 728 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

> The Supreme Court has outlined the tests a plaintiff must meet to succeed in a hostile work environment claim: (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

19

O'Rourke, 235 F.3d at 728 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-89 (1998); Harris, 510 U.S. at 20-23; Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-73 (1986)).

"In hostile environment cases, the fourth and fifth elements are typically the most important," and "must be determined by the fact-finder 'in light of the record as a whole and the totality of the circumstances.'" O'Rourke, 235 F.3d at 728 (quoting Meritor, 477 U.S. at 69). The relevant circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1st Cir. 2001) (quoting Harris, 510 U.S. at 23). With respect to the severity or pervasiveness of the conduct at issue, "offhand comments, and isolated incidents are not sufficient to create actionable harassment; the hostile work environment standard must be kept sufficiently demanding to ensure that Title VII does not become a general civility code." O'Rourke, 235 F.3d at 729 (quoting Faragher, 524 U.S. at 788) (citation and internal quotation marks omitted).

As explained above, Asselin's claim rests solely upon the things she claims Waldron said and did in her presence, plus the comment he made to Kennedy and Treuhaft about her "assets" for the job; no other conduct by Waldron is sufficiently supported by affidavit. Based upon the conduct properly before the court, Asselin has failed, as a matter of law, to establish facts from which a reasonable jury could conclude that Waldron's demonstrable conduct created a hostile work environment.

Asselin did not encounter Waldron every day, but at most once a week, and for many months, her contact was even less frequent. From her several dozen encounters with him, she has identified approximately a half-dozen objectionable statements or acts. At no time did Waldron ever touch Asselin, and none of his comments can reasonably be construed as threatening.

Waldron's arguably most egregious act, his gesture and comment about Asselin's "assets," took place outside Asselin's presence, and was not disclosed to her until after she left xWave. Accordingly, that conduct did not offend Asselin in the workplace, since she was not aware that it occurred. Cf. Brooks

21

v. City of San Mateo, 229 F.3d 917, 924 (9th Cir. 2000) ("Harassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive."); Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995) ("Doi could not subjectively perceive Coleman's behavior towards others as creating a hostile work environment unless she knew about that behavior."); Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1522 (11th Cir. 1995) ("some of the incidents relied upon were not made known to [plaintiff] Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment") (citation omitted).[3] So, while the gesture and comment about Asselin's assets might well qualify as objectively offensive, and surely would have been subjectively offensive to Asselin had she been aware of them, it

---

[3] If Asselin had provided affidavits sufficient to bring all of the comments by her co-workers before the court, then this case would have presented an interesting legal question: whether the subjective offensiveness element is met when a plaintiff is treated poorly by her co-workers, but in an apparently sex-neutral way, and later learns that she had been the of butt sexual derision that may have motivated the poor treatment by her co-workers. Here, however, the court need not reach that question because Asselin does not assert that Waldron's gesture and comment about her "assets" was perceived by anyone other than Kennedy and Treuhaft, neither of whom stands accused of treating Asselin poorly as a result of Waldron's offensive conduct.

22

did not contribute to a hostile work environment for her because she was not aware of it.

Waldron's other conduct, the things he said and did in Asselin's presence (all of which took place in the presence of third parties) may well have been subjectively offensive to Asselin, but that conduct falls far below the level of objective offensiveness.  The most severe comment, the one about Asselin's sexy voice, was ill-advised, but relatively innocuous.  The incidents with the eyeglasses and the name tags may have been mildly demeaning, and the comment about the cellphone may have been insensitive, but that is all; those incidents, both individually and collectively, do not amount to more than offensive utterances, offhand comments, and isolated incidents. In other words, Asselin's adequately supported assertions against Waldron do not describe conduct that rises to the level of intimidation, insult, abuse, or humiliation necessary to support a Title VII claim.  Accordingly, defendants' motion for summary judgment is granted with regard to the hostile work environment component of Asselin's Title VII claim.

23

B.    <u>Intentional Infliction of Emotional Distress</u>

In addition to her Title VII claim, Asselin asserts a claim of intentional infliction of emotional distress against Waldron. The specific conduct she cites as actionable is Waldron's "conduct in creating, and/or failing to prevent and/or remedy sex discrimination, sexual harassment, and creating and/or failing to prevent a hostile, abusive, and discriminatory work environment." (Compl. ¶¶ 57 and 58.)  Plaintiff characterizes that conduct as both "willful and intentional" (Compl. ¶ 57), and "extreme and outrageous" (Compl. ¶ 58).  Defendant moves for summary judgment, arguing that if the conduct alleged by Asselin was not severe enough to create a hostile work environment, under Title VII, it could not possibly clear the even higher threshold for establishing intentional infliction of emotional distress. Plaintiff counters that a reasonable jury could find that Waldron regularly and persistently carried out a series of extreme and outrageous personal attacks on her, based upon her appearance, with the intention of impeding her professional advancement and forcing her to resign.  The court does not agree.

24

Under New Hampshire law, "[o]ne who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for that emotional distress." Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260 (1998) (citing Morancy v. Morancy, 134 N.H. 493, 495 (1991)). In Morancy, the New Hampshire Supreme Court recognized the tort of intentional infliction of emotional distress. 134 N.H. at 495. In the process, it adopted the approach of the RESTATEMENT (SECOND) OF TORTS § 46, id. at 495-96; see also Godfrey v. Perkin-Elmer Corp., 794 F. Supp. 1179, 1188-89 (D.N.H. 1992) (citing Jarvis v. Prudential Ins. Co. of America, 122 N.H. 648, 652 (1982)).

> Comment d [of the RESTATEMENT (SECOND) OF TORTS § 46] offers the following guidance:
>
>> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> "This standard plainly anticipates outrages far beyond the indignities and insensitivity that too often taint our daily lives." Clay v. Advanced Computer Applications, Inc., 370 Pa.Super. 497, 536 A.2d 1375,

25

> 1385 (Pa. 1988), rev'd in part on other grounds, 522
> Pa. 86, 559 A.2d 917 (Pa. 1989).  In determining
> whether conduct is extreme and outrageous, it should
> not be considered in a "sterile setting detached from
> the surroundings in which it occurred," and such
> behavior should be found to exist "only if the average
> member of the community must regard the defendant's
> conduct as being a complete denial of plaintiff's
> dignity as a person."  Wethersby v. Kentucky Chicken
> Co., 86 Md.App. 533, 587 A.2d 569, 578, cert. granted,
> 324 Md. 90, 595 A.2d 1077 (1991).

Godfrey, 794 F. Supp. at 1189.


No reasonable jury could conclude that Waldron's alleged conduct was sufficiently extreme to subject him to liability for intentional infliction of emotional distress.  Plaintiff has produced no evidence from which it could be found, or even inferred, that Waldron had any intention of causing Asselin emotional distress.  But leaving aside the question of intent, Waldron's alleged conduct, albeit sophomoric and insensitive, was not outrageous or "utterly intolerable in a civilized community." Godfrey, 794 F. Supp. at 1189 (citations omitted).


The emotional distress claim in Godfrey arose from the following facts:

26

> [Plaintiff] charges that, in a sexually suggestive, demeaning, and socially inappropriate manner, [defendants] stared at her and made statements to her which had no connection with her duties or the business of the company. She also contends that they, repeatedly and intentionally, attempted to engage her in conversations of an inappropriate and sexual nature. Furthermore, they confined her to her desk area by sitting and standing inordinately close to her, often in a sexually suggestive manner, which was not necessary for any work-related business and which prevented her from completing her assignments. Plaintiff also alleges that Wilson informed her that she was expected to accompany him to lunch, alone, and that it was part of her duties as his secretary to do so.

Id. at 1183. Here, by contrast, there is no evidence of any sort of physical or other intimidation of plaintiff and no evidence of any overtly sexual comments directed to her. Rather, the evidence shows that Waldron made two requests that plaintiff interpreted as offensive gender stereotyping (the eyeglass and name tag incidents), and made an inappropriate comment about her "sexy voice" having played a role in landing an account. This is not a close question. The undisputed factual record, viewed in the light most favorable to plaintiff, falls far short of the minimum necessary for a reasonable jury to conclude that Waldron is liable for the common law tort of intentional infliction of

27

emotional distress. Accordingly, defendants' motion for summary judgment is granted as to Count VII.

## Conclusion

For the reasons given above, defendants' motion for summary judgment (document no. 9) is granted.  The Clerk of the Court shall enter judgment in accordance with this order and close the case.


**SO ORDERED.**


                                   _____
                                   Steven J. McAuliffe
                                   United States District Judge

January 13, 2004

cc:  John C. Duff, Esq.
     Timothy J. O'Brien, Esq.